UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL LEWICKI,

                                    Plaintiff,

                    v.                                    No. 06-cv-06347 (SAS)

ENZO BIOCHEM, INC., HEIMAN GROSS,
BARRY WEINER, ELAZAR RABBANI,
SHARIM RABBANI, DEAN ENGELHARDT,
and JOHN DOES 1-50,

                                    Defendants.

## SECOND AMENDED COMPLAINT

Plaintiff Paul Lewicki, by his attorneys, complains against Enzo Biochem, Inc., Heiman

Gross, Barry Weiner, Elazar Rabbani and Dean Engelhardt (collectively, the "Enzo individual

defendants"), and unknown others (John Does 1-50) as follows:

## Introduction

1.      Enzo Biotech, Inc. ("Enzo" or the "Company") engages in the research,

development, manufacture, and marketing of diagnostic and research products based on genetic

engineering, biotechnology, and molecular biology.  In 1998, Enzo had been a public company

for eighteen (18) years.  Enzo's principal business has always been its diagnostic and laboratory

business.  By 1998, Enzo was engaged in pre-clinical studies relating to, among other things,

HIV and Hepatitis B infection in human cells.

2.      Beginning, at the latest, in 1998, Enzo, the Enzo individual defendants and

Sharim Rabbani schemed, conspired, and aided and abetted each other, as well as John Does 1-

50, whose identity is presently unknown to plaintiff, to manipulate the price of the common

stock and options of Enzo by making material misrepresentations to the public, including this

plaintiff, about the Company, including, but not limited to, misrepresentations about the progress

of its pre-clinical and clinical trials, its Stealth Vector, and its patent estate.  The

misrepresentations, discussed in detail herein, were made in press releases, at institutional

presentations, during interviews, to brokers, and at the Company's 2000 annual shareholders'

meeting, which the plaintiff personally attended.

3.      Enzo, the Enzo individual defendants and Sharim Rabbani made these

misrepresentations in order to artificially inflate the market price of the Company's stock,

thereby facilitating their pump and dump scheme, whereby they dumped in excess of $48 million

of Enzo stock in late March 2000.

4.       Plaintiff, who relied upon these misrepresentations in purchasing shares of the

Company, lost in excess of two hundred and eighty thousand dollars ($280,000) as a result

thereof.

### **Parties and Affiliates**

5.      Plaintiff Paul Lewicki is a citizen and resident of the State of New Jersey.

6.      Defendant Enzo Biochem, Inc. is a publicly traded company on the New York

Stock Exchange and is incorporated in New York with its principal place of business in New

York.  Enzo is also traded on the Pacific Stock Exchange, the Midwest Stock Exchange, the

Boston Stock Exchange, the Chicago Stock Exchange, and electronically on the third market.

Enzo is registered to sell its share to New Jersey residents, such as plaintiff.

7.      Defendant Barry Weiner is the president of Enzo and is a member of its board of

directors.  On information and belief, Weiner is a citizen and resident of New York.

8.      Defendant Elazar Rabbani and his brother Sharim Rabbani are the brothers-in-law

of Barry Weiner.  They are also the CEO and COO, respectively, of Enzo and are members of

the Enzo board of directors.  On information and belief, Elazar Rabbani is a citizen and resident
of New York.

9.     Defendant Dean Engelhardt is the executive vice president of Enzo and, on
information and belief, is a citizen and resident of New York.

10.     Defendant Heiman Gross is a consultant to Enzo.  He is designated to perform
services for Enzo in the area of investor relations and is authorized by the Company to speak on
the Company's behalf.  Defendant Gross is a citizen and resident of New York.

## Jurisdiction and Venue

11.     Subject matter jurisdiction is conferred on this Court through diversity jurisdiction
pursuant to 28 U.S.C. §1332.  The matter in controversy exceeds the sum or value of $75,000,
exclusive of interest and costs.

12.     The transactions, statements, practices, and course of conduct alleged herein
occurred within the Southern District of New York and defendant Enzo and one or more of the
alleged co-conspirators reside in the Southern District of New York so that venue is proper in
this district pursuant to 28 U.S.C. §1391.

## The Misrepresentations

13.     In the summer of 1998, following a series of setbacks for Enzo which included a
protracted legal battle with an industry competitor over a patent and a significant loss in revenue
as a result of reductions in reimbursements for Medicare services, the price of Enzo stock dipped
to the $6 range.  This low would be followed by a steady rise that eventually would reach a fever
pitch in 2000.  Announcements by Enzo of encouraging test results for a new treatment
employing antisense technology for people with HIV were behind the enthusiasm for the
Company's prospects.  In July 1999 Enzo's stock traded at $14 per share. By November 1999, it

reached $25 per share, then, following a number of statements by Enzo and the Enzo individual defendants, in and around January 2000, it soared past $75, eventually topping out at $139 on January 25, 2000.

14.     In or around late 1997, in press releases dated November 3, 1997 and December 18, 1997, Enzo announced that it would be conducting human trials of its HIV/AIDS therapy.  In late 1998, the human trials began.

15.     The 1998 protocol establishing the Phase I trial of the Company's HIV/AIDS therapy, copy of which is attached hereto as **Exhibit 1,** was entitled "Evaluation of the Safety and Effects of Ex-Vivo Modification and Reinfusion of CD34 Cells by an Antisense Construct Against HIV-1 in a Retrovirus Vector" (emphasis supplied) (the "Protocol")**.**  The Protocol listed as part of its aims the measurement of the T cell count and the viral load in patients who were administered the Company's HIV/AIDS therapy **(Exhibit 1, page 3)**.  Recognized FDA markers for efficacy of a treatment for HIV/AIDS would require an increase in T cell count and a reduction of the viral load.  The study design called for monitoring the peripheral blood for HIV-1 viral load **(Exhibit 1, page 4)**.  One of the identified aims of the Protocol was to "measure the circulating HIV-1 viral load and the numbers of CD4+ T cells as a function of time post treatment." **(Exhibit 1, page 3).**

16.     The Protocol provided that "viral load and CD4 T cell counts will be monitored to provide a means to determine the effectiveness of the antisense should a high enough proportion of the cells express the antisense" (emphasis supplied) and that an assessment would be made over time graphing the baseline value of anti-HIV-1 antisense as well as CD4 T cell counts, viral burden, and summary statistics by time point of the viral load **(Exhibit 1, page 11).**  The Protocol advised the patient that he could benefit by participating in the study if the infusions

resulted in "an increase in reconstitution of immunity and reduction in HIV-1 viral load. This may result in prolongation of life." In March 2001, however, the National Institutes of Health Recombinant DNA Advisory Committee ("RAC") made Enzo delete the language setting forth the potential benefit and replace it with a disclosure that "there is no anticipated clinical benefit to participants in this study."

17.    In late 1998, the human trials began. On information and belief, Enzo knew, in 1999, that the trials were failing, but concealed this from the investing public. The Protocol and several other documents, including Enzo press releases, indicated that the goal of the Phase I Protocol was to test the efficacy of the vector in increasing the T cell and decreasing the viral load. For example, the University of California San Francisco Consent to be a Research Subject document stated that the purpose was to find out "if these gene-modified cells will grow and survive in the presence of HIV infection and eventually eliminate the virus." Similarly, in the November 3, 1997 Enzo press release regarding the first human trials, Dr. Engelhardt stated: "We are looking forward to the evaluation of the safety _and efficacy_ of our especially quiet type of gene delivery system" (emphasis added). In the December 18, 1997 press release regarding the trials, Dr. Engelhardt stated: "Patients will be followed to see whether their overall T cell count has increased, how they respond and how the progression of HIV has been affected." There was, however, no increase in the T cell count or decrease in the viral load of any patient involved in the Phase I study.

18.    Thus, beginning in or about 1999, but not later than April 1999, Enzo knew that its Phase I study was not going very well and it was only a matter of time before the investing public and capital markets became aware of this. Enzo knew that it could not stay in Phase I forever and still maintain that the trial was a success and on schedule. With the intent of

5

dumping their shares on an unsuspecting marketplace and obtaining prices that would have been substantially lower had the true facts been known Enzo and the Enzo individual defendants, along with Sharim Rabbani, conspired and schemed to artificially inflate the market price of Enzo stock by making false statements or materially misleading and fraudulent representations, by omitting or causing Enzo to omit material facts necessary to make the statements made not misleading, and by failing to disclose the facts necessary for maintenance of the efficiency of the capital market in Enzo's publicly traded securities and the integrity of the market prices for Enzo securities.  These misrepresentations and omissions were made in statements by Enzo and the individual defendants in press releases, at institutional presentations, in interviews, to brokers, and at the 2000 annual shareholders' meeting.  These misrepresentations and omissions related to:  (a) Enzo's patent estate; (b) the progress of its HIV pre-clinical and clinical trials; (c) the efficacy of its gene therapy; and (d) the timing of a major diagnostic transaction with a pharmaceutical company.  The purpose of the hype was to provide a context, and further impetus, within which to artificially inflate the market price of Enzo securities, and to defraud and mislead, the capital markets.

19.    The January 2000 annual shareholders' meeting became the lightning rod to exaggerate, hype and pump the stock for the planned dump that would enable the defendant directors to sell their Enzo securities at inflated prices.

### The January 2000 Annual Shareholders Meeting

20.    The 2000 Enzo annual shareholders meeting was held on January 12, 2000 at the Yale Club of New York.  Plaintiff was among the stockholders present at this annual meeting.

21.    At the 2000 annual shareholders meeting, both defendants Weiner and Engelhardt gave presentations that had been pre-approved by defendant Elazar Rabbani, who has a PhD and

is the Chief Executive Officer of Enzo with overall responsibility for all of Enzo's technology, including its gene therapy. Defendant Rabbani also spoke at the shareholders meeting and endorsed the progress that allegedly had been made over the previous year, including, but not limited to, the claims related to Enzo's gene therapy. Defendant Rabbani conspired with defendants Weiner, Engelhardt and Gross, as well as Sharim Rabbani and John DeLucca, to overstate the progress of the gene therapy, particularly its effectiveness in the treatment of AIDS, in order to increase the market price of Enzo's stock.

22.     At the annual meeting, the Company reported that its therapeutic division had made significant progress in several areas. The Company also stated that it was strongly poised to benefit from new, exciting trends in drug development, and the diagnosis and treatment of disease.

23.     Barry Weiner, President of Enzo, said at the meeting that the Company's Phase 1 clinical trial, testing Enzo's proprietary therapeutic treatment for HIV-1 infection, was proceeding satisfactorily and on schedule.

24.     Dr. Engelhardt stated that "it works, they both work." Dr. Engelhardt's reference was to Enzo's gene therapy treatment for HIV/AIDS and Hepatitis B, and, by saying "they both work," he was representing that the treatments for HIV/AIDS and Hepatitis B were efficacious. As it relates to HIV/AIDS, the standard FDA markers of efficacy are that the T cell counts increase and the viral loads decrease. In fact, there was no increase in the T cell count or decrease in the viral load as a result of Enzo's gene therapy treatment. At the time this statement was made by Dr. Engelhardt, and at all times since the issuance of the statement, defendants knew that this was an untrue statement. All the Enzo individual defendants were present when

this statement was made and no one at any time attempted to correct or clarify this representation.

25.     At the meeting, Dr. Engelhardt reported on the progress of the HIV clinical trial by stating: "It's all over, but the shouting." By that, Dr. Engelhardt was advising the shareholders that the Phase I trial was successful. Similarly, Barry Weiner, President of Enzo, stated that the Company's Phase I clinical trial, testing Enzo's proprietary therapeutic treatment for HIV-1 infection, was proceeding satisfactorily and on schedule.

26.     At the meeting, Dr. Engelhardt likened Enzo's treatment to the "Roach Motel" – the virus goes in but does not come out. Engelhardt also said that although the FDA would not allow the Company to say that it cured AIDS, the Company had, in fact, killed the virus.

27.     At the 2000 annual shareholders meeting, Weiner told the shareholders that Enzo would be opening up three more clinics, totaling four, by the end of fiscal year 2000 to treat HIV and AIDS patients. Weiner predicted that Enzo would be able to treat 9,500 patients per clinic at a charge of $30,000 per patient. Weiner omitted to state that Enzo did not have FDA permission to open such clinics and that such permission had never been sought by Enzo and could not, in any event, be obtained within that short a period of time. Weiner also omitted that under government regulations, Enzo could not receive revenue for any of the treatments until the FDA approved such treatment for commercialization. Even if the Company was permitted to treat such patients at these clinics, the Company would receive no revenue. Therefore, no basis existed for Weiner to make the statements at the time the statements were made, and he knew, or should have known, that.

28.     At the 2000 annual shareholders meeting, Weiner stated that the Company had submitted the Phase I data to the FDA and was awaiting approval of a Phase II. A similar

statement had been previously made by Weiner during at least two institutional presentations in 1999. At institutional presentations occurring on or about June/July 1999 and August/September 1999, Weiner stated that "Phase II/III was about to begin" and "would commence by the end of 1999 or early 2000." The statements by Weiner as to the commencement of Phase II were false at the times they were issued because Enzo never had any data upon which the FDA could base a Phase II approval. Furthermore, a protocol application for Phase II was never submitted to the FDA by the Company. Weiner also omitted to state at that time that only one patient had been treated and that the data from that patient was not confirming any of Enzo's precontemplated or any valued therapeutic markers. Weiner omitted that other patients had been treated previously and all were lost to follow-up. Weiner knew, or should have known, that these statements were false and misleading.

29.     At the same meeting, Enzo continued to tout its HGTV vector for delivering genes to human cells, a process called transduction. Weiner stated that during the trial, Enzo scientists had been able to substantially reduce the time period required for successful transduction to eighteen hours, as compared with previous transduction of up to three months. This was accomplished, he said, because HGTV-43 was shown to transduce non-growing cell populations. "This short transduction period," said Mr. Weiner, "has many advantages, most of all, the stem cells will not differentiate to a great degree and thus, the patient will have a greater chance of receiving true stem cells." Weiner omitted that the absence of any positive data from the previous patients had caused Enzo to directly modify the Protocol. Specifically, Enzo omitted a technique intended to grow treated cells outside the body because when they attempted this step, the cells became invalid, which was not an anticipated event. Enzo never generated

evidence that it had overcome this problem and decided that eighteen hours of transduction was all the cells could tolerate of the originally "months long" process of transduction and growth.

30.    Moreover, there was no indication that even the eighteen hour treatment had alleviated this problem.  Weiner omitted that the data had been negative and had put the traits behind in terms of the period of time that had transpired from the FDA approval to commencement of the trials, which was July 13, 1998, to the issuance of his statement in January 2000.

31.    In addition, Weiner stated at the 2000 annual shareholders meeting that HGTV-43, Enzo's gene transfer vector, was able to achieve levels of stable gene transfer (transduction) to the patients' non-growing blood stem cells greater than 30%, a technical breakthrough in the development of commercially viable gene medicine.  The statement was also known by him and the other defendants to be false when it was made.

32.    At the annual shareholders meeting, Enzo also stated that its HGTV vector was ready for commercialization.  However, the vector had not been commercialized, nor has Enzo presented any other utility involving its "ready to commercialize" vector.  In the title of a press release, Enzo touted it was exploring expansion of its trials.  To this day, the trials have not expanded nor has any written protocol been presented to expand the HIV trials.

33.    Based upon prior press releases, HGTV-43 had been tested in Cornell in 1996.  However, based on the publication in the Journal of Virology and Enzo's homepage, the antisense genes Enzo used were placed into human cells with Lipofectin.  Lipofectin is a system not owned by Enzo that inserts genes or antisense genes into cells.  Enzo also touted in prior press releases that Gene Sert was to be used for this purpose.  Gene Sert was Enzo's universal, patented, gene delivery system.  Lipofectin is based on a specific kind of lipid (fat molecule).

10

Gene Sert was an AdenoViral vector.  HGTV is a Moloney Murine Leukemia Virus vector.  The commentary made to shareholders at 2000 annual shareholders meeting and in press releases was directed toward the "universal, patented and ready to be commercialized vector of choice" at the time each statement was issued.  Because the vectors did not work, Enzo keeps changing vectors without an announcement to its investors.

34.    At the annual shareholders meeting, Weiner also discussed the possibility that Phase II and Phase III could be fast-tracked by the FDA on the basis of compassionate use.  Implicit in being able to obtain fast-track status is that the treatment is effective.  Weiner had no basis whatsoever to make such a statement, which was not only false, but irresponsible.

35.    Plaintiff believed the aforesaid statements to be true and relied on them in making his investment decisions to purchase and accumulate Enzo securities.

36.    These statement were false or omitted material information, or were materially misleading and were made for the purpose of artificially inflating the market price of Enzo common stock and for the specific purpose of inducing plaintiff to purchase Enzo shares and options, which would invariably affect the price of the stock and options as well as to discourage the plaintiff from selling his shares, which would have had the effect of driving the price of the stock down.

37.    All of the foregoing statements and omissions, which occurred during the 2000 annual shareholders meeting, were intended to induce plaintiff and the public to invest in Enzo stock the securities of Enzo, and were in furtherance of the conspiracy to inflate the price of Enzo stock.  Such statements and omissions were made with defendant Rabbani's knowledge and connivance, and defendant Rabbani did nothing during or after the meeting to correct these statements even though he knew these statements to be untrue.

38.    Although Enzo proffered that it was strongly poised to benefit from its drug developments, Enzo has failed, to this day, to demonstrate that it was strongly poised at the time the statement was issued.  The Phase I trials were woefully behind.  In fact, no schedule even existed for the Phase I trials.  The touted improvement from three months to eighteen hours was, in fact, a midstream protocol modification, the purpose of which was to eliminate the use of external growth for stem cells.  In fact, the patients would receive far less cells than Enzo had originally hoped for.  The patients who initially participated clearly did not receive true stem cells, and, the first three patients who subsequently may have been falsely identified as "lost to follow-up" may actually have left the trials because their blood did not have evidence of the Enzo-treated cells.

39.    The statements made at the annual shareholders meeting were known to be false when made and/or were materially misleading as among other things, they omit to state that this data was based on one patient's data at the time, and perhaps more importantly, the shareholders and capital markets were assured that there was a schedule in place with time frames, when, in fact, there was not.  Defendants knowingly, intentionally and maliciously made the misleading statements which were material and made with the intent that plaintiff, as a purchaser of Enzo's publicly traded securities, would reasonably rely thereon and plaintiff did so rely to his detriment.  Plaintiff was thereby fraudulently induced to invest in and hold the securities of Enzo at artificially inflated prices.

### Misrepresentations by Defendants in Press Releases and to the News Media

40.    Both Weiner and Engelhardt gave reports to the press concerning the efficacy of the gene therapy.  For example, in a January 20, 2000 article in Business Week, Barry Weiner was quoted as saying that the early results from the clinical trials have produced "impressive

positive results." In an article in the Dow Jones News Service on February 16, 2000, Weiner is quoted as saying "We can stop the virus cold," and Engelhardt is quoted as saying the treatment does more than stop the virus cold, "It makes the virus disappear." Clearly, these statements were not true.

41.    In a Business Week Online article which ran on January 31, 2000, Weiner stated that "early results from certain aspects" of clinical trials have produced "impressive positive results." Weiner went on to state that the Company was "seeing continued activity of the cells" which were being treated with Enzo's gene medicine. Weiner then stated that the therapy was a "breakthrough" in genetic medicine to fight the replication of infected cells.

42.    In the January 31, 2000 Business Week Article, Donald Selkin, identified as chief strategist at the investment firm of Joseph Gunnar, attributed the run-up in the Company's stock to a 2 million-share short position, which he, in turn, attributed to announcements being made by the Company regarding the success of its clinical trials: "The news on the HIV tests spurred the shorts."

43.    In the Dow Jones News Release, which ran on February 16, 2000, Weiner and Engelhardt are quoted as stating that the clinical trials "have gleaned promising data." The Dow Jones Release continues:

> This gene medicine is designed to act like a "three-headed bomb" for an assault on the HIV virus at three different points in case the virus mutates, said Weiner, adding that by injecting antisense RNA, "we can stop the virus cold."

Engelhardt is quoted in the Dow Jones Release as stating: "Using genetic antisense, we are creating a cell that (can be) permanently resistant to the HIV virus."

44.    In the Dow Jones Release, Weiner spoke of a planned expansion of the clinical trials:

13

Buoyed by this information, Enzo intends to expand its clinical trials, conducted at the University of California in San Francisco, to additional sites, and increase the patient population in order to determine safety and efficacy data, said Weiner.

"The potential of what we have here has yet to be realized," Weiner said. "What lurks within our company is so much product potential and once the product is tested, the whole pipeline underneath.

45.     After the market price of the stock collapsed to $35, Enzo issued a press release on April 13, 2000 stating that it had no explanation for the collapse in the price of the stock, all remained well with Enzo, and the human trials currently being conducted were on schedule. This press release was designed to calm the market and to provide a base for the next pump. The press release was materially false and constituted a fraud on the marketplace. Enzo knew that the sale of shares by insiders was a negative as it demonstrated a lack of confidence by top management. In addition, Enzo had actually come to believe that, as a result of the death of Jesse Gelsinger, an eighteen-year old who had been treated with gene therapy in a University of Pennsylvania study that was not affiliated with Enzo, there would be more FDA scrutiny of human trials involving gene therapy that would in all likelihood result in delays and added expenses. Enzo's statement that the trials were proceeding on schedule was a false statement or materially misleading because it omitted to state that Enzo had no schedule with any time frames regarding these trials. If Enzo had any schedule, it was woefully behind from the point that Enzo discovered HGTV-43 treated cells were not behaving predictably or normally.

46.     In the April 12, 2000 press release, Enzo commented that its "fundamentals are solid and the company holds a uniquely strong scientific position. The recent activity of the stock merely mirrors the general weakness that has affected the entire biotech industry and in no way reflects Enzo's intrinsic value." Enzo further commented that its "proprietary therapeutic

technologies in selective immune down regulation and genetic modulation, combined with a

broad-ranging roster of patents and advanced products in the areas of genomics and diagnostic

applications, positions Enzo to play a key role in the rapidly advancing field of biotechnology as

this millennium gets underway."  Enzo further commented:  "We cannot control the market

activity of the stock, but we do know that the science that has been under development at our

company for more than 20 years, resulting in advanced treatments now undergoing human

clinical trials with promising results, provides us with a great deal of encouragement regarding

Enzo's growth opportunities."

47.    In the same press release, Enzo then stated that (1) the clinical study at the

University of California, San Francisco for HIV-1 infected patients is moving towards it final

stages; (2) Enzo has reported that HGTV-43, the Company's proprietary medicine, has

successfully delivered – and continues to deliver – antisense genes effectively and quickly to

blood stem cells outside the human body; (3) following transduction and infusion into the

patients, these genetically engineered cells continue to survive in circulation and continue to

produce antisense RNA over many months; (4) an abstract has been accepted for an oral

presentation to be given at the American Society of Gene Therapy in June 2000; (5) the

Company knows of no other system that has achieved these levels in unablated adult patients

(patients in which the blood cells have not been destroyed) and this proprietary system has

application to the entire field of gene medicine; and (6) it views this achievement as a critical

first step forward in development of a gene medicine for the treatment of HIV-1 infection and

plans for Phase 2 clinical studies are now proceeding.

48.    In addition, Enzo stated that (1) it has built a pioneering patent position in broad

areas of genetic analysis, including labeling and detection products for gene sequencing and

genomics, drug development, and clinical diagnosis of a wide range of diseases; (2) it has been awarded over 200 patents worldwide, and almost a like number of patent applications have been filed; (3) it "views these patents and applications as valuable assets of the company, including the use of this portfolio to advance revenues from manufactured products; and (4) its patent portfolio is one of its most crucial assets, one it has worked on for many years, and one it aggressively enforces.

49.    At the time of this press release, Enzo's trials had not produced promising results and as to the HIV trials, had actually produced very negative results. The press release touting that there was nothing wrong with the Company and that the negative stock price performance was a manifestation of "mirroring the market" were not representations Enzo believed at the time the press release was created and placed before unsuspecting shareholders.

50.    Enzo never filed for its purported HIV Phase II, during which efficacy is studied. Enzo never asked for permission to treat frank AIDS, a rumor which had been started by the Company and was picked up later, in subsequent press releases, such as the June 2, 2000 Dow Wire headline, "Enzo to Treat Frank AIDS," a press release created by the Company:

> "Our ultimate goal is to achieve for HIV-1 infected individuals a long-term, lifelong immune responsiveness in a disease characterized by progressive loss of this defensive mechanism. Base on the results thus far we believe we have made significant progress towards this goal," said Dean Engelhardt, Ph.D., a Senior Vice President of Enzo.
>
> An Enzo spokesperson said that based on the Phase I trial results Enzo is preparing an application for a Phase 2 study involving patients with frank AIDS.

Weiner knew that Phase II is a phase in which efficacy is studied as doses are varied. Enzo never had any attributable efficacy report at any time with its Protocol and University of

California at San Francisco trials and did not have any attributable efficacy to study as a result of its Phase I effort.

51.    Enzo failed to see any efficacy marker in its Phase I trials that validated the vector or genetic antisense.  It had actually witnessed the failure of HGTV-43 and the defendants freely elected to state the opposite.  This was the time frame where investors were reasonably anticipating the opening of four clinics.  During the January 2000 shareholders meeting, Weiner had stated that the Phase I data had been submitted to the FDA and Enzo was currently awaiting approval of a Phase II.  Investors were therefore anticipating FDA approval of something that did not exist at the time Barry Weiner issued these comments.  The cause of the rise and fall of the Enzo stock price was well known to Enzo and the individual defendants, but hidden from the plaintiff by the defendants.

52.    In that same press release, Enzo represented that it had approximately 200 worldwide patents, with as many pending.  These statements, which appeared in many press releases, were materially misleading and omitted to state material facts necessary to make the statement not misleading, to wit:  Enzo has only 36 U.S. patents.  At the time the statement was made, Enzo had approximately 20 to 30 patents.  The remaining patents are simply the same patents issued in other countries.  As to pending patents, the United States Patent and Trademark Office permits the public disclosure of pending patent applications as of March 2001, and it does not appear even remotely possible that Enzo has "200" patents currently pending.

53.    Enzo's claim regarding its patent estate is a material statement as it relates to the value of the Enzo stock and is the kind of information upon which a reasonable investor would rely.  Anyone can generally file a patent application.  Only a very small percentage of applications become bona-fide patent grants.

54.    The statements about the Phase I data were known to be false when made and/or were materially misleading as, among other things, they omitted to state that this data was based on five patients and, perhaps more importantly, the shareholders and capital markets were assured that there was a schedule in place with time frames when, in fact, there was not. Defendants knowingly, intentionally and maliciously made the misleading statements that were material and made with the intent that plaintiff, as a purchaser of Enzo's publicly traded securities, would rely thereon and plaintiff, in fact, reasonably relied thereon to his substantial detriment.  Plaintiff was thereby fraudulently induced to invest in the securities of Enzo at artificially inflated prices.

## Other Misrepresentations

55.    As part of the conspiracy to pump the stock, Enzo, through defendants Weiner and Gross, selectively disseminated information concerning the Company's prospects that was not otherwise publicly available to a cadre of brokers whom defendants knew would pass it on to their retail clients, thereby artificially inflating the price of Enzo stock, creating false demands, and simultaneously inducing active and significant shareholders, such as plaintiff, not to sell their shares, which would have provided downward pressure on the market price and would have hampered defendants' ability to inflate the price to the highest price possible for their dump.

56.    In particular, information concerning future events that were not publicly disclosed was passed directly by defendants Weiner and Gross to brokers George Somkin, Bob Berlin and Phil Sloan, among others.  Although it is a violation of New York Stock Exchange rules and NASD rules for a Series 7 broker to pass on or trade on inside information, defendants Weiner and Gross disseminated this information to the brokers with knowledge that these

brokers would violate the NYSE and NASD rules and pass this information on to their retail clients, who collectively owned millions of shares of Enzo, much of it on margin.

57.     Gross also made numerous false statements to an investment advisor named Robert Jernigan in 1999.  For example, in May 1999, he stated that a major diagnostic deal with a European company was expected in much less than one year; that the progress in Enzo's therapeutics was "enormous;" that its Stealth Vector was achieving transduction in cells at a rate of 50-90% with an average of 80%, while normal transduction in cells is from ¾% to 1%; that they expected a patent to issue in 18 to 24 months; and that clinicians were "thrilled" with the results that had been obtained in Phase I and they were going to begin Phase II while Phase I was continued.  Similarly, in August 1999, Jernigan was told that the HIV therapeutics were "working, working, working – doing great."  Finally, in December 1999, Jernigan was told that the "clinicals were going well, but [they were] seeing so many unusual happenings [that] must be reported to the FDA – all good happenings, no bad."

58.     In addition, Weiner and Gross passed on non-public material information to Doug Yates for the purpose of Doug Yates disseminating that information to other brokers.  Yates aided and abetted the individual defendants by willingly serving as a conduit disseminating inside information, most of which was false and all of which was intended by defendants to pump the price of the Enzo stock so that they would have the ability to dump it at an inflated price.

59.     As part of the scheme to artificially inflate the price of Enzo stock and its options, Enzo provided false and inflated revenue estimates to the analyst from Brenner Securities, which, among other factors, led him to project an initial target price of $111 per share (**Exhibit 2, page 1).**  When the Brenner analyst later learned that the revenue estimates were incorrect and

for other reasons, including regulatory issues that were know by Enzo at the time of the first report, he lowered his target price to $40 per share the following year.

60.    As part of the scheme to further inflate the market price of Enzo, Enzo, through its president, defendant Weiner, planted a false and misleading article in Business Week Online which ran on October 11, 2000.  Weiner provided the names of individuals for the reporter to contact and encouraged these people to cooperate in the article.  Individuals who were denoted as insiders revealed that there was an interest by a major pharmaceuticals company to do a joint venture with Enzo and that there had been a buyout offer.  The statements were made for the purposes of overstating Enzo's ability to do a joint venture transaction within the near future and the possibility that Enzo could be a takeover candidate.  In fact, the statements were false.  No buyout offer had ever been made, yet the Company did nothing to correct the inaccuracies in the article.

61.    The Business Week Online article predicted that the Enzo shareholders would be receiving very good news at the end of the month relating to the progress that had been made with their therapeutics.  Indeed, Barry Weiner was quoted as saying that Enzo was the only company that had been able to obtain engraftment without ablation.  Less than three months later, Enzo attempted to amend its Protocol to include ablation as engraftment had failed.  The Business Week Online article is an example of Enzo encouraging and actively leaking inside information, which inside information turned out to be false and misleading.

62.    A press release dated October 2, 2000 reported that "new data on the first individual treated in the Phase I clinical trial of HGTV-43, the Company's HIV-1 gene medicine product, show that after nine-and-one-half-months Enzo engineered cells have successfully

engrafted in the patient's bone marrow and were spawning new differentiated CD4+ cells designed to fight the virus."

63.     When this data was disclosed to the public at a March 8, 2001 RAC meeting, it was shown that engraftment had actually failed.  There was no evidence provided to indicate that the new differentiated CD4+ cells, which the press release purported to exist, were designed to fight the virus.  Enzo reported to the RAC in March 2001, using information available to Enzo at the time of the October 2, 2000 press release, that the viral loads of several patients had actually increased, some to the point of being chronic.  No patient's T cell counts had been improved or restored at any time.  These developments would have been consistent with the reasoning and logic Enzo originally used to inform the prospective patients subscribing to the Protocol that a clinical benefit was possible and specifically spelled out that the benefit would be the increase in T cells and a decrease in viral load.  This purported new development was never used in the original informed consent document to substantiate the Protocol as potentially therapeutic to prospective patients.

64.     Since the true markers for HIV+ therapy had not been achieved and viral loads were substantially rising in several patients, as a safeguard, the Protocol was abandoned or substituted midstream and all patients were then placed on HAART (standard HIV+ drug-based therapy), which was not part of the Protocol design and created an unknown and unintended influence upon any further data observed in these trials.  The Protocol was abandoned or substituted because (a) it did not purport to include placing the patients on HAART midstream, and (b) it had failed to describe any effect upon data or observations should the patients be selected and treated with HGTV-43 while using HAART or if the patients were later placed on HAART after HGTV-43 treatment.

21

65.     Since HAART is an effective FDA approved combination therapeutic for HIV+ conditions, and since no means to demonstrate HGTV-43 efficacy versus HAART efficacy was built into the Protocol or demonstrated to the RAC on March 8, 2001, the Protocol was, in fact, abandoned or substituted when the patients were placed on HAART.

66.     Furthermore, even with HAART, the reported conditions of the patients continues to be inclusive of at least one patient with a high viral load and no improvement in T cell counts in any patient.  To date, no one has clinically benefited from the use of HGTV-43.

67.     Defendant Engelhardt then stated in a press release dated on or about October 2, 2000 that:  "This is a dramatic result, one that underscores, in the light of the other achievements we have recorded in this trial, that our gene medicine and technology designed to counter the HIV virus is on the right track."  Curiously, all other markers Enzo set out to improve had never been affected positively by HGTV-43 at any time, in any patient in these trials.  The cells have not proven themselves effective against HIV infection.  Enzo has strayed from its prepublished Protocol to try and name new markers and claim victory in achieving these markers when (a) the markers are not accepted by peers or regulatory agencies, and (b) even the belated claims made now are not agreed upon by the RAC, which means that even substituted markers were also not achieved.

68.     In particular, at the RAC, Dr. Fung specifically stated that there was a failure to engraft.  Dr .Mickelson indicated that the level of engraftment was a failure.  She asked Enzo as to why they thought radiation would facilitate engraftment.  Drs. Engelhardt, Conant and Laurence from Enzo stated that they did not know whether radiation would increase the chance for successful engraftment.  They acknowledged that the change in Protocol providing for radiation was to see whether they could achieve successful and sustained engraftment.

22

Mycophenylate mofetil ("MMF") was discussed in similar fashion and the RAC doctors, including Dr. Fung, indicated that they did not believe that MMF would make any detectible difference.  The meeting, which lasted approximately one hour, is videotaped and archived and is the best source of what occurred at the meeting, rather than the minutes of the meeting, which is merely a summary of what occurred.  The streaming video of the entire RAC meeting can be located at http://videocaset.nih.gov/ram/rac030801.ram.

69.    Several of the five remaining patients had seen soaring HIV levels and were placed on the standard HAART therapy for HIV+ patients and the data of the initial patients treated prior to the five shown was to be omitted.  It was not until June 2001 that plaintiff received, pursuant to the Freedom of Information Act, a redlined copy of the aforementioned "finalized" informed consent document, which, among other things, indicated that patients with a high viral load or low T cell count were excluded from the study so that the press release concerning the treatment of the patients with frank AIDS was false.  **See Exhibit 3**.

70.    More importantly, Enzo's claims in the press releases that its treatment was effective were contradicted in its admission in the informed consent form that there was no anticipated therapeutic benefit.  The dialogue at the RAC meeting also demonstrated that the press releases relative to the T cell count were either false or misleading in that Enzo did not check to determine whether T cells were operative, mature, and diverse according to the TREC analysis or immunoscope analysis, which is a prerequisite for determining successful immune system reconstruction.

71.    Enzo also admitted that the use of low dose myoablation was specifically intended to reduce background cells and thus reduce signals obtained when taking measurements to see

why the treated cells do not grow as anticipated. This too, is not spelled out in the Patient Informed Consent document.

### The Market Reaction to Enzo's Misrepresentations

72.     Notwithstanding that final FDA approval of Enzo's gene therapy may be years away and that there is no guarantee that approval will ultimately be obtained, the market nonetheless places a value on the perceived progress. A procedure that is in clinical trials has a higher value than a procedure that is in a pre-clinical phase. A successful Phase I potential product is more valuable than a Phase I trial that is just beginning.

73.     In the analysis issued by Brenner Securities on Enzo in October 2000 (the "Brenner Report"), a copy of which is attached as **Exhibit 2** and which set a target price of $111/share (**Exhibit 2, page 1**), Brenner valued the gene therapy portion of Enzo stock at $72 per share. **(Exhibit 2, page 11).**

74.     The lion's share of the perceived value of Enzo's stock was in the therapeutic portion of the business, notwithstanding that there was no FDA approval for any of these therapies.

75.     Likewise, Brenner placed a proposed value on Enzo's patent estate, which included HGTV-43, even though commercialization was not at hand.

76.     UBS/Warburg made similar analyses valuing the separate components of Enzo's business to reach its target price of $76 per share. Brenner, Warburg and the market were misled in valuing Enzo's market price as Enzo covered up its failure in the clinical tests and grossly misstated its progress.

77.     In a February 6, 2000 Newsday article, entitled "Newest Apples of Wall Street's Eye Enzo and other biotechs now hot with investors," commented on the rapid rise in Enzo's stock price in early 2000:

> The stock really began its climb in January. An article in Business Week the last week of the month reported that Enzo had some success in early clinical trials of its HIV gene therapy. The stock continued to run when Enzo executives outlined the clinical trials at an industry conference in San Francisco.

78.     In a February 18, 2000 Wall Street Journal Online article, entitled "Online Investors Feel Good About Enzo's New Treatment," the jump in the Company's stock price was discussed and attributed to the January 12, 2000 press release which summarized statements made and the annual shareholders meeting that day: "But the big jump came Jan. 12, after the Company said in a press release that it told shareholders at its annual meeting of "significant progress in several areas" in its drug-development unit."

79.     Further proof that the capital markets were misled by defendants' scheme can be found in the high premiums for the options of Enzo stock. For example, in July 2000, when the price of the stock was approximately $70 per share, an October $100 call was selling in excess of $10 per share. Investors were only willing to pay such a high premium because of the fraud that had been committed on the capital markets.

80.     The above-identified conduct set the stage for a dump by the insider defendants.

### Pump and Dump

81.     Enzo and the individual defendants, as well as Sharim Rabbani, through their scheme as set forth below, engaged in a successful pump and dump during the first quarter of 2000, when the investing public, including plaintiff, was falsely told by Enzo and the individual

defendants that the trials were successful and on schedule, that Phase II would be beginning

shortly, and that Enzo would be opening up clinics to treat HIV and AIDS patients in April 2000.

82.     For the fifteen years preceding 2000, the market price of Enzo common stock was

less than $20 per share.  As a direct result of the fraud committed by Enzo and the Enzo

individual defendants, as well as Sharim Rabbani, with the assistance of Doug Yates, they were

able to artificially inflate the market price of the stock seven-fold, or to its all-time artificial high

of $139 per share, so that they could dump in excess of $48 million of their stock at

approximately $81 per share.  John DeLucca dumped all of his shares for approximately $2

million.  The stock never traded higher subsequent to the March 28, 2000 date of the dump by

Rabbanis and Weiner.  A ten-year chart of Enzo's stock prices is attached hereto as **Exhibit 4**.

The first dump is marked on the chart as point A.

83.     By 1999, Enzo had been a public company for 19 years.  Defendants Weiner and

the Rabbanis had never sold any of their shares.  The individual defendants conspired with each

other and unknown others to artificially raise the price of Enzo stock and its options for the sole

purpose of permitting them to dump some of their holdings at highly inflated prices.

84.     The chart attached as **Exhibit 4** shows the Enzo share price for the last ten years.

In 1999, when the price of Enzo stock was approximately $10 per share, the individual

defendants decided to artificially inflate the share price of Enzo so that they could dump their

shares at a high price.

85.     DeLucca sold all his holdings.  The individual defendants tried to conceal the

effect of the sale of the stock by having defendant Gross and possibly other defendants tell

shareholders and others that the only reason that DeLucca sold his stock was because he was

required to in his pending divorce. In fact, DeLucca had been divorced approximately three years earlier and his sale had nothing whatsoever to do with his divorce.

86.    Similarly, defendant Engelhardt sold approximately $350,000 worth of stock in March 2000.

87.    On information and belief, defendants Weiner and the Rabannis transferred, sold, hedged or constructively sold 600,000 shares of Enzo stock on March 28, 2000 that had an inflated market value of over $48 million. Defendants Gross and Weiner tried to blunt the impact of the sale by claiming that the transfers were made as gifts to their children and that the trusts still retained the shares. This statement was false as plaintiff learned that defendant Weiner had confided in a consultant, Rahul Singh, that the shares had been sold.

88.    The defendants' March 28 sales occurred a few days before the month of the alleged promised openings of the clinics and the anticipated revenue stream. Immediately after the sales, the Enzo market price declined precipitously. Within approximately two weeks, the market price had dropped from $81 per share to $35 per share. The drop in the market price of Enzo stock was more severe than the drop in the Biotech Index for the same period.

89.    The fact that Enzo had not announced its cure of AIDS at the annual retrovirus convention in January/February 2000, which rumor had contributed to the initial spike in share price, and the fact that no clinic had opened by April 2000 and that Enzo had not announced that it was in a Phase II trial undoubtedly cast doubt in the market as to the veracity of the claims that were made at the annual shareholder's meeting concerning the efficacy of the Company's gene therapy. The inklings that the therapy was not as efficacious as reported was slowly leaking into the market for those sophisticated enough to recognize what was occurring, which unfortunately did not include the plaintiff.

90.    As a result of the decline of the market price of Enzo stock, defendants again had to prime the pump if they wanted to sell shares. Defendants knew that the price for which they could sell their shares would again be dependant on the then current market price.

91.    Part of their scheme and artifice was not only to permit the individual defendants to dispose of their shares at artificially inflated prices, but to allow other individuals whose identifies are presently unknown to plaintiff to sell covered calls and to short the stock with impunity as they were advised of Enzo's true condition. Hence, while Enzo's prospects were being artificially inflated through false and misleading press releases and private comments that were knowingly and purposefully widely disseminated, selected individuals continued to short the stock reaping huge profits, During the pump and dump, the short interest in the stock rose to over four million shares, an all time high for Enzo.

92.    Enzo's largest shareholder is J. Morton Davis, who acquired his shares through D.H. Blair, who was responsible for taking Enzo public. Davis's son-in-law, Dr. Lindsey Rosenwald, who runs a hedge fund, began shorting Enzo at $130 per share and began aggressively shorting Enzo with a vengeance on March 29, 2000, the day after the individual defendants disposed of their shares. This is a unique time frame in that the public would not know about the sale and even after it did, it would view the sale as a transfer. By April 15, 2000, Rosenwald, through his domestic and Cayman Island hedge funds, had made over $5 million, as a direct result of these trades.

**Drop in Enzo's Stock Price**

93.    Throughout the calendar year 2000 and 2001, when Enzo failed to announce that it was in Phase II testing, that clinics had opened or make any announcements concerning its cures for either AIDS, HIV or liver cancer, the price of Enzo stock continued to drift lower as

28

sophisticated investors recognized that Enzo's claims were either outright false or hyped. In particular, Fidelity, which through its funds owned over one million six hundred thousand shares of Enzo, sold every share it had owned within 2000. By the first quarter of 2001, Enzo stock was trading approximately where it had traded for the prior eighteen years, as the market digested and corrected for the hype.

94.    A clear pattern exists for 2000 with respect to an increase in the price of the Company's stock coinciding with positive announcements by the Company and a decrease in the Company's stock coinciding with (i) materialization of risk and (ii) selective or belated corrective disclosure.

95.    Following the January 2000 annual shareholders meeting and related press releases in January and February 2000, the stock climbed to an all-time high of $139 per share, and traded through April 10 at an average closing of $78 per share. Thereafter, based upon the materialization of risks, the stock dropped to a low close price of $33 per share on April 17, 2000 and traded at an average close per share price of $37 through June 1, 2000. On June 2, 2000, a positive press release by the Company precipitated another steady rise in the Company's stock during which the Company's stock had an average close of $65 per share through July 24, 2000. The June through July 2000 rise in stock price was brought to a halt on July 25, 2000, the date that the UBS Warburg Private Placement Memorandum ("UBS PPM") was circulated to certain members of the investment banking community. The UBS PPM is currently under seal in the United States District Court for the Eastern District of Virginia. The document was placed under seal by Judge Lee in similar litigation brought by Larry Glaser against defendants. On the day the UBS PPM was circulated, as the direct result of information disclosed to a portion of the investment banking community in the UBS PPM, in the last hour of trading, the stock fell from a

high price of $72 per share to close at $58 per share.  The UBS PPM contained corrective disclosures which were announced to certain members of the investment banking community, and which directly caused a drop in the price of the Company's stock.  In the months that followed, the price of the stock continued to decline, and averaged a $43 per share closing price for the rest of the year.

### Loss Causation

96.    Defendants' misrepresentations and omissions were relied upon by plaintiff, who purchased and/or held securities of the Company in reliance upon such misrepresentations. Plaintiff's losses in his investments in Enzo were proximately caused by defendants' misrepresentations, and the drop in the price of the Company's stock was a foreseeable consequence of such misrepresentations and omissions.  As discussed herein, a rise in the price of the Company's stock directly follows misrepresentations and omissions made by the defendants.  When events that were the subject of misrepresentation did not occur – for example, the opening of further clinics, significant headway in the cure for AIDS, or the commencement of Phase II – the stock price foreseeably dropped.  Similarly, when a UBS PPM disclosure occurred to certain members of the investment community, the stock price foreseeably dropped. In each of these instances, plaintiff suffered losses.

97.    The misrepresentations and omissions of defendants concealed from plaintiff and the general public the risks associated with investing in the Company's stock.  As set forth herein, a significant portion of the value of the Company's stock in 2000 was tied to the gene therapy portion of Enzo stock.  **(Exhibit 2, page 11).**  The inflated price of Enzo's stock would be corrected upon (i) the materialization of the undisclosed risks of the investment and (ii) the

corrective disclosure to a portion of the investment banking community in the form of the UBS PPM.

98.     At the time of the annual shareholders meeting on January 12, 2000, the market price of Enzo had risen to $44 per share.  As a result of statements made by Enzo and the individual defendants regarding the opening of the clinics, the efficacy of the gene therapy moving into Phase II testing from Phase I, the market price of the stock continued to rise dramatically.  Fueled by rumors that Enzo was going to announce its cure for AIDS at the Retrovirus Conference at the end of January 2000, the stock traded as high as $139 per share on January 24, 2000.  Prior to the January 12, 2000 annual shareholders meeting, the stock averaged $43 per share for the month of January.  Following the January 12, 2000 annual shareholders meeting, the stock averaged $75 per share for the remainder of the month.  The rise in the price of the Company's stock was directly attributable to the statements made by defendants at the annual shareholders meeting and in press releases and media articles thereafter.

99.     During the first quarter of calendar year 2000, the stock settled in a range of $80 to $100 per share, which was approximately seven times the price range the stock had experienced during the prior ten years.  The price of the stock during this period had been bolstered by the misrepresentations of defendants as set forth herein.  A copy of the historical prices of Enzo's stock for the relevant time period is attached hereto as **Exhibit 5**.

100.    During the three months following the annual stockholders meeting, no clinics were opened, no further announcement was made regarding Enzo's cure for AIDS or that it had moved from Phase I to Phase II testing.  At the end of March 2000, the market, based on Enzo's January 2000 statements, anticipated an announcement regarding the imminent opening of the clinics and the move to Phase II testing.  Nothing occurred.  By mid-April, when the clinics were

to have opened the stock dropped precipitously from the $80 per share price range to approximately $35 per share.

101.    As of mid-April 2000, plaintiff held approximately $87,120 in call positions of the Company's stock.  **See Exhibit 6**[1].  Each of these calls was purchased in late March to early April, when the stock was still performing well, and each was sold on April 24, 2000.  The April 24, 2000 sales followed the materialization of risks previously undisclosed by the Company to plaintiff and the public in general.  Plaintiff suffered $87,120 in losses as a result thereof.

102.    Enzo's failure to make any announcement was tantamount to a constructive corrective notice.  The market corrected the price of Enzo stock to a level lower than what it was prior to the time Enzo made its misstatements.

103.    In April 2000, Enzo issued a press release that everything was on schedule and it had no explanation for the sudden drop in the market price of the stock.  Thereafter, the stock began a steady climb fueled by speculation that the announcement for Enzo's cure for AIDS was going to take place at an AIDS conference in June 2000 and later there was going to be an announcement that Enzo had a cure for liver cancer.  When that announcement did not take place in June 2000, it was anticipated that it would take place at the Liver Conference in October 2000.  By July, the stock was trading in the upper $60 to lower $70 range.  As a result of these two projected announcements, the Enzo stock price hit the same level as it reached during the first quarter of 2000.

---

[1] The sources for the transactions set forth in **Exhibit 6** are plaintiff's Schedule Ds to his federal tax returns for the years 2000 through 2001.  It appears that the Schedule Ds are incomplete.  Therefore, the transactions set forth on **Exhibit 6** may not represent all of the plaintiff's transactions in the securities of Enzo for the time period 2000 through 2001.  If it is determined that there are additional transactions in the securities of Enzo, Plaintiff intends to seek permission from the Court to amend **Exhibit 6**.

104.    Unbeknownst to plaintiff, Enzo and some of the individual defendants were in the process of implementing a private placement through UBS Warburg.  Details of the private placement are omitted in this filing pursuant to a protective order.

105.    While at the 2000 Enzo annual shareholders meeting, Plaintiff and the public were told "that it was all over but the shouting," that "the FDA would not let them say they cured AIDS, but that they killed the virus," and that the therapy would be commercialized, that clinics would be opening in three months, and that FDA approval was a foregone conclusion.  However, the UBS Warburg private placement memorandum told a completely different story.

106.    The lock up letters for the UBS PPM were signed on July 25, 2000 and the UBS PPM began circulating that day.  On that day, July 25, 2000, Enzo had traded at approximately $72 per share within the last hour of trading.  During that last hour, the price of Enzo dropped from $72 per share to approximately $57 per share on July 25, 2000.  The following day, July 26, 2000, shares of the Company's stock closed at $55 per share on high volume.  Upon information and belief, the drop in the price of the Company's stock during this last hour of trading was a direct result of information related to the Company and the efficacy of its HIV therapy which was set forth in the UBS PPM.  **See Exhibit 5.**

107.    The UBS PPM acted as a corrective notice to a substantial segment of the institutional investment community.

108.    The UBS PPM also acted as a corrective disclosure to that community regarding the bullish statements and prospects that Enzo outlined at the annual shareholders meeting.  The price of the Company's stock would continue to drop from July 25, 2000 until late August 2000.

109.    As of the date of the UBS PPM, July 26, 2000, plaintiff held approximately $137,750 in call positions of the Company's stock.  These positions were purchased on July 17,

July 21 and July 24, 2000, and were sold on August 19, 2000 at a total loss. Plaintiff's losses with respect to these options were directly caused by the Company's corrective disclosure to certain members of the investment community in the form of the PPM.

110. Beginning in late August 2000, the stock price drifted slightly higher on speculation that favorable comments were to be made at the UBS conference in October 2000 and the Liver Conference in October 2000. When no pronouncement had been made at the Liver Conference regarding either the opening of clinics, the moving from Phase I to Phase II, or an announcement regarding a cure for AIDS, the stock plummeted. By January 16, 2001, the approximated date of the 2001 shareholders meeting, the stock was trading at approximately $25 per share.

111. As of mid-October 2000, Plaintiff was holding approximately $55,600 in call positions of Enzo stock. These positions were purchased in September and early October 2000 on Plaintiff's reliance on the false representations and omissions of defendants. The positions were sold on October 21 and November 18, 2000 at a complete loss.

112. Enzo and the individual defendants' failure to make timely announcements of scheduled events consistent with statements made at the January 2000 shareholders meeting acted as constructive corrective notice of their misstatements and was accepted by the market as such, which led to the aforesaid dissipation of the market price of Enzo stock.

113. On October 5, 2000, an analyst for Brenner Securities wrote a research report regarding Enzo and set a target price of $111 per share. The analyst broke down the components of Enzo's business and valued each of them separately. The analyst valued the HIV treatment at $71 per share as of 2001. At the time, the HIV therapy had no revenue whatsoever as it could not commercialize its products without FDA approval. The analyst, however, estimated that in

Enzo's fiscal year beginning July 1, 2001 through June 30, 2002, the HIV therapy would have revenue of $95 million.  Hence, the analyst established that Enzo's HIV therapy represented more than 63% of the entire value of the Company.  The analyst further stated that the HIV share value and revenue production would increase nearly 300% over the next four years.

114.    The analyst believed, based on research at Enzo and in consultation with at least Weiner, who had viewed the report before it was circulated, that the therapeutics division would be revenue generating, which meant that the FDA approval had to have been obtained.  No FDA approval was in fact obtained and no announcement was made moving from Phase I to Phase II, the revenue for the therapeutics division never materialized, and, by the following year, Brenner Securities issued a new report setting a target price of the entire company at $40 per share.  The substantial lowering of the target price, which was a direct result of a failure to commercialize its HIV treatment therapy or any other products in the therapeutic division demonstrates that the market and the investment community became aware that the risk of non-commercialization had actually occurred.

115.    Plaintiff held Enzo securities during the first quarter in 2000, the summer of 2000 and through the fall of 2001, and was affected by the market corrections, which resulted from a combination of constructive notices and actual corrective notices to selected segments of the public and market and the materialization of the risk of non-approval by the FDA of Enzo's HIV treatment therapy.  **See Exhibit 6**.

116.    In addition, Plaintiff, on information and belief, alleges that Fidelity, through its funds, had acquired a major position in Enzo, owning in excess of one million shares.  These shares were accumulated during the first half of 2000.  Subsequent to Enzo's distribution of the PPM to selected investors, Fidelity sold its entire position in Enzo, which further contributed to

the decline in the price of Enzo stock. On information and belief, Plaintiff alleges that Fidelity sold its Enzo shares as a direct result of the information contained in the PPM. The information relied upon by Fidelity was materially inconsistent with the information provided by Enzo to the plaintiff and the general public both during the 2000 shareholders meeting and subsequently.

### Plaintiff Acted with Diligence

117.    Plaintiff Lewicki knew Larry Glaser as a result of the fact that Lewicki was a frequent poster on the Yahoo! Message Board, the Enzo appreciation club, and a private Enzo club, which he founded. By the end of 2000 and the beginning of 2001, Plaintiff had suffered substantial losses relating to his investment in Enzo. Plaintiff believed that there may have been fraud perpetrated upon him relating to the trading in Enzo securities at that time.

118.    Plaintiff still fervently believed the gene therapy for the treatment of AIDS was effective and that the statements that had been made to him by Enzo representatives were true. However, Plaintiff also suspected that Enzo may have been engaged in a market manipulation in which favorable reports relating to its business prospects were being suppressed so that unknown individuals could short the stock with impunity and know when to cover.

119.    Because of this suspicion, Plaintiff decided to investigate the trading activity in Enzo Securities in order to determine what, if any, action could be taken. Plaintiff recognized that acting alone or even in concert would be cost-prohibitive and so it was necessary for him to seeks assistance from others.

120.    Glaser had retained counsel to investigate the matter and to file a lawsuit on his behalf regarding the perceived securities fraud. Even though Glaser's shareholder position in Enzo at one time had been valued at over $100 million, his stock had been liquidated in connection with margin calls and he was being forced to file for bankruptcy. His resources were

limited.  The plaintiff, Mssrs. McMahon, Cavanagh and Hunt and Ms. Pope entered into an agreement with Glaser to assist in the investigation of Glaser's claim, with the objective that based on the investigation, the individual claims on their behalf would be subsequently filed.

121.    Plaintiff has not had any formal education in science.  Throughout the relevant period, Enzo continued to insist that its gene therapy was effective.  Enzo took that position not only in the Glaser litigation, but also in its press releases subsequent to June 2001 and in subsequent shareholders meetings as recently as 2006.  To this day, Enzo has never admitted that its gene therapy did not work.

122.    Glaser attended the RAC meeting in March 2001 and subsequently reported to the plaintiff that, in his opinion, Enzo's gene therapy was a failure.  Because Glaser had no formal training in microbiology and he was understandably bitter about what had occurred to him and due to plaintiff's lack of any formal training in biology or genetics, plaintiff was unable to understand what had actually occurred at the RAC meeting.  Due to his inability to understand the science, plaintiff was unable to form an opinion based on what he was told as to whether Enzo's or Glaser's opinion was correct.

123.    Sometime in the summer of 2001, Glaser obtained certain informed consent forms prepared by Enzo in conjunction with its Phase I HIV study through the Freedom of Information Act ("FOIA") and provided copies to plaintiff.  Although the informed consent indicated there was no expected therapeutic effect from the therapy, plaintiff was advised that informed consents in general are written so as to not raise the expectations of participants in order to protect the principals of the study from any exposure to liability.

124.    In March 2002, plaintiff was aware that Glaser had filed suit in the United States District Court for the Eastern District of Virginia.  He was also aware that Enzo and the

individual defendants had filed a motion to dismiss and that included with Glaser's Amended Complaint as an exhibit was the informed consent form that Glaser had obtained pursuant to FOIA. Oral argument occurred on the motion to dismiss in December 2002. On April 17, 2003, the district court indicated that it was going to dismiss Glaser's complaint and an opinion would follow thereafter. In view of the fact that Glaser's complaint was being dismissed, plaintiff could not prudently have filed his own action against defendants without knowing the basis for the dismissal.

125.    On July 16, 2003, the trial judge issued a 45 page opinion. In this opinion, Judge Lee found that all the statements that had been made relating to the efficacy of the gene therapy were not material as a matter of law because it was in the context of a Phase I test. Particularly significant was Judge Lee's express finding that Plaintiff [Glaser] did not understand the science, thereby effectively negating Glaser's reliance upon the alleged admissions contained in the informed consent forms, which were attached to Glaser's complaint. Glaser v. Enzo Biochem, Inc., 303 F.Supp.2d 724, 740 (E.D. Va. 2003). In fact, the very same allegations regarding the informed consent form that were made in the instant complaint were made verbatim in the Glaser complaint, which the district court found to be beyond the comprehension of that plaintiff.

126.    As a result of Judge Lee's memorandum opinion, plaintiff was unable to file his own suit for fear of being sanctioned. Certainly, if such suit had been filed, Enzo would have moved to dismiss, citing Judge Lee's findings of fact and conclusions of law relating to his claim.

127.    Glaser filed an appeal and the Fourth Circuit reversed Judge Lee on March 21, 2005. Until then, plaintiff could not have filed suit for fear of being sanctioned.

128.    Plaintiff here envisioned that after the Fourth Circuit's decision, discovery would begin immediately in Glaser's law suit which would provide plaintiff an opportunity to complete his pre-suit investigation.  However, immediately upon remand, Enzo and the individual defendants filed a new motion to dismiss, which was granted by Judge Lee on July 14, 2005.

129.    Plaintiff waited until the end of the New Jersey statute of limitations to file his lawsuit, in order to continue and complete his investigation to determine whether he in fact had a basis for filing a claim.  Plaintiff throughout acted diligently and in good faith, particularly in view of Judge Lee's finding that no claim existed as a matter of law and that Glaser, who had far greater knowledge of the science than the plaintiff, did not understand the science.

130.    Defendants have not been prejudiced as a result of plaintiff's delay in filing the lawsuit because defendants have been on notice since March 2002 concerning the factual allegations of the complaint by virtue of the Glaser lawsuit.  Defendants also knew of the existence of this plaintiff as part of their discovery in the Glaser case.

131.    The information material to plaintiff's investigation was solely known to Enzo and particularly the individual defendants and their co-conspirators and almost completely under their control.  Plaintiff had no basis other than through discovery to learn any details relating to whether Enzo's gene therapy was effective other than the fact that six years after the announcement at the 2000 shareholders meeting, Enzo had not moved from Phase I to Phase II or opened any clinics.

**Count I**

**Common Law Fraud**

132.    Plaintiff restates and incorporates herein by reference all the allegations contained in paragraphs 1 through 131.

133.     During the period 1999 through 2002, plaintiff invested in the securities of Enzo for his personal account and for his 401K account.  **See Exhibit 6.**

134.     All of Plaintiff Lewicki's purchases, accumulations and retention decisions were made in good faith based upon plaintiff's reliance upon the representations of Enzo and the individual defendants as alleged herein.

135.     As a result of the defendants' conduct as set forth herein, plaintiff suffered damages and losses in excess of two hundred and eighty thousand dollars ($280,000).

WHEREFORE, Plaintiff prays for judgment as follows:  against all defendants in an amount to be determined at trial, but not less than $280,000, plus punitive damages, attorney's fees and costs.

### PLAINTIFF DEMANDS TRIAL BY JURY

Dated: New York, New York
       January 31, 2008

**LAW OFFICES OF DAN BRECHER**
Counsel for Plaintiff


_____\s\ Dan Brecher_____
Dan Brecher (DB-5308)
99 Park Avenue, 16th Floor
New York, NY 10016
(212) 286-0747