Donald H. Chase (DC-6708)
MORRISON COHEN LLP
909 Third Avenue
New York, New York  10022
Ph:   (212) 735-8600
Fax: (212) 735-8708
Attorneys for Enzo Biochem Inc. and Barry Weiner

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANCIS SCOTT HUNT and SUNDRA CHERI HUNT, individually and as Trustee for IAN CHRISTOPHER HUNT, PAUL LEWICKI, LAWERENCE A. MCMAHON and JUDITH J. MCMAHON, PAUL D. CAVANAGH  individually, and as Trustee for the PAUL D. CAVANAGH  TRUST, and VIRGINIA POPE,<br><br>Plaintiffs,<br><br>-against-<br><br>ENZO BIOCHEM, INC., HEIMAN GROSS, BARRY WEINER, ELAZAR RABBANI, SHARIM RABBANI, JOHN DELUCA, DEAN ENGELHARDT, and JOHN DOES 1-50,<br><br>Defendants. | 06 Civ. 00170 (SAS) |
| KEN ROBERTS,<br><br>Plaintiff,<br><br>-against-<br><br>ENZO BIOCHEM, INC., et al.,<br><br>Defendants. | 06 Civ. 00213 (SAS) |
| PAUL LEWICKI,<br><br>Plaintiff,<br><br>-against-<br><br>ENZO BIOCHEM, INC., et al.,<br><br>Defendants. | 06 Civ. 06347 (SAS) |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS ENZO BIOCHEM, INC. AND BARRY WEINER

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ...........................................................................................2

ARGUMENT.............................................................................................................2

POINT I:    THE CLAIMS OF PLAINTIFFS LEWICKI,
            CAVANAGH AND POPE ARE BARRED BY RES JUDICATA.............2

POINT II:   THE CLAIMS OF PLAINTIFFS ROBERTS AND
            CAVANAGH ARE BARRED BY THE STATUTE OF
            LIMITATIONS ........................................................................................5

            A.    The Enzo Defendants Were Amenable To Jurisdiction In
                  California ......................................................................................5

            B.    The Enzo Defendants Were Amenable To Jurisdiction In
                  Massachusetts As Well ..................................................................7

POINT III:  PLAINTIFF LEWICKI LACKS THE CAPACITY TO
            PURSUE HIS COMPLAINT BECAUSE OF HIS FAILURE
            TO DISCLOSE IT IN HIS BANKRUPTCY PROCEEDING .................10

POINT IV:   PLAINTIFFS CANNOT PROVE AS A MATTER OF LAW THE
            REQUISITE ELEMENTS FOR THEIR COMMON LAW FRAUD
            CLAIM....................................................................................................11

            A.    Enzo's Alleged Misrepresentations Are
                  Either Demonstrably True Or Not Actionable...............................12

            B.    Plaintiffs Did Not Reasonably Rely On Any Alleged
                  Misstatements ...............................................................................14

                  1.    Plaintiffs Did Not Actually Rely On Any Purported
                        Misstatements ...................................................................15

                  2.    Any Alleged Reliance On The Enzo Defendants' Purported
                        Statements Was In Any Event Not Reasonable As A Matter
                        Of Law ..............................................................................17

i

C.   Plaintiffs Cannot Prove Loss Causation .........................................19

    1.   Plaintiffs Cannot Show That Enzo's Stock Price Fluctuation Was Attributable To Misrepresentations Rather Than Market Volatility .......................................................20

    2.   The UBS PPM Was Not A Corrective Disclosure............21

D.   Lewicki and Pope's Claims Also Fail Due To Additional Deficiencies.................................................................................22

E.   Plaintiffs Lewicki, Cavanagh And Pope Are Unable To Prove Actual Damages ............................................................................24

CONCLUSION........................................................................................................25

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634 (2d Cir. 1987) ....................................2

*Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 108 S. Ct. 2218 (1988) ..............9

*Braune v. Abbott Labs.*, 895 F. Supp. 530 (E.D.N.Y. 1995) ...............................................9

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ..................................................7

*Calder v. Jones*, 465 U.S. 783 (1984) ...............................................................7

*Catton v. Defense Tech. Sys.*, No. 05 Civ 9654, 2006 U.S. Dist. LEXIS 205
(S.D.N.Y. Jan. 3, 2006) ..............................................................................21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................2

*Dole Food Co. v. Watts*, 303 F.3d 1104 (9th Cir. 2002) ............................................6, 7

*Doyle v. Shubs*, 717 F. Supp. 946 (D. Mass. 1989) ....................................................9

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) .................................................21

*Ferris v. Cuevas*, 118 F.3d 122 (2d Cir. 1997) ......................................................3

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) ...........................21

*Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474 (4th Cir. 2006), *cert. denied*, 127 S. Ct. 1876
(2007)...............................................................................................2

*Glaser v. Enzo Biochem, Inc.*, No. 03-2188, 2005 U.S. App. LEXIS 4598
(4th Cir. Mar. 21, 2005) ...........................................................................12

*Hampshire Equity Partners II L.P. v. Teradyne, Inc.*, No. 05-CV-2279,
2005 U.S. App. LEXIS 28817 (2d Cir. Dec. 20, 2005) ................................................14

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122 (9th Cir. 2003) ............6

*Hunt v. Enzo Biochem, Inc.*, 471 F. Supp. 2d 390 (S.D.N.Y. 2006) .................................5, 7

*Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580 (S.D.N.Y. 2008) .........................12, 14, 19

*In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 351 n.1 (S.D.N.Y. 2003) ...............13

*In re Marsh & McClennan Cos., Inc.*, 501 F. Supp. 2d 452, 495 (S.D.N.Y. 2006) .....................14

*In re Williams Sec. Litig. - WCG Subclass*, No. 07-5119, 2009 U.S. App. LEXIS 3032
(10th Cir. Feb. 18, 2009) ..................................................................................................21

*Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215 (1st Cir. 1989) .........................8

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) .........................................21

*Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y. 2006) .......................................21

*Mark v. Obear & Sons Inc.*, 313 F. Supp. 373 (D. Mass. 1970) ......................................8

*Ruiz v. Commissioner of Dep't of Transp.*, 858 F.2d 898 (2d Cir. 1988) ........................3

*Sea Trade Co., Ltd. v. FleetBoston Fin. Corp.*, No. 03 Civ. 10254,
2008 U.S. Dist. LEXIS 67221 (S.D.N.Y. Sept. 4, 2008) ...........................................11

## STATE CASES

*Balloon Bouquets, Inc. v. Balloon Telegram Delivery, Inc.*, 466 N.E.2d 523 (1984) ..................8

*Chase-Walton Elastomers, Inc. v. Bennett*, No. 02-1304,
2002 Mass. Super. LEXIS 368 (Super. Ct. Oct. 1, 2002) .............................................9

*Darcy v. Hankle*, 768 N.E.2d 583 (App. Ct. 2002) .........................................................8

*David v. Biondo*, 92 N.Y.2d 318, 680 N.Y.S.2d 450 (1998) ............................................3

*Gray v. Michael Stapleton Assocs., Ltd.*, 2007 Mass. Super. LEXIS 157
(Super. Ct. May 7, 2007) ................................................................................................9

*Heins v. Wilhelm Loh Wetzlar Optical Machinery GmbH*, 522 N.E.2d 989 (1988) ......................9

*Heritage Marketing Ins. Servs., Inc. v. Chrustawka*, 160 Cal. App. 4th 754,
73 Cal. Rptr. 3d 126 (Ct. App. 2008) ............................................................................9

*Hernandez v. Barcelo Hotels & Resorts*, Nos. B170853, B172114,
2005 Cal. App. Unpub. 351 (App. Ct. Jan. 13, 2005)...................................................7

*Mehlenbacher v. Swartout*, 289 A.D.2d 651, 734 N.Y.S.2d 290 (3d Dep't 2001) ......................11

*In re Slocum*, 183 A.D.2d 102, 588 N.Y.S.2d 930 (3d Dep't 1992) ................................3

*Snowney v. Harrahs Entm't, Inc.*, 35 Cal. 4th 1054, 29 Cal. Rptr. 3d 33 (2005) ..........7

*Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 370 N.Y.S.2d 315 (1970) ...........................3

*Whelan v. Longo*, 7 N.Y.3d 821, 822 N.Y.S.2d 751 (2006) ..........................................11

## STATE STATUTES

California Code Civil Procedure § 338(d) (2006) ........................................................................5

California Code Civil Procedure § 351(d) (2006) ........................................................................5

California Code Civil Procedure § 410.10 (2006) ........................................................................6

Massachusetts General Laws ch. 223A, § 3(d) ...........................................................................7

Massachusetts General Laws ch. 260, § 2A ...............................................................................5

Massachusetts General Laws ch. 260, § 9 .................................................................................5

Defendants Enzo Biochem, Inc. ("Enzo") and Barry Weiner (collectively, the "Enzo Defendants"), through their attorneys Morrison Cohen LLP, respectfully submit this memorandum of law in support of their motion for summary judgment.

## PRELIMINARY STATEMENT

Four plaintiffs remain in these three actions: Paul Cavanagh, Virginia Pope, Ken Roberts, and Paul Lewicki ("Plaintiffs"). Plaintiffs' only claim is premised on a common law fraud in connection with their investment in Enzo securities. With discovery now closed, Plaintiffs' claim fails based on a multitude of procedural and substantive deficiencies.

Initially, three dispositive procedural impediments bar Plaintiffs' claims. First, Plaintiffs Cavanagh, Pope and Lewicki are barred by res judicata since the facts unequivocally demonstrate that they are privies to Larry Glaser who unsuccessfully pursued a virtually identical proceeding against these same defendants. Second, the only other Plaintiff, Roberts, is barred by the statute of limitations as the facts demonstrate that the Enzo Defendants were amenable to the jurisdiction of California (and this Court previously ruled that Roberts' claim would be time-barred in that event). Cavanagh's claim is likewise time-barred because Enzo was amenable to jurisdiction in his home state of Massachusetts. Third, Plaintiff Lewicki lacks the capacity to bring his claim because he neither disclosed nor adjudicated the claim in his personal bankruptcy proceeding.

Even if those procedural bars did not exist, the Plaintiffs are still unable to establish the requisite elements of their fraud claim. First, the alleged misrepresentations of the Enzo Defendants are either demonstrably true or not actionable because of their forward-looking nature or expression of opinion. Second, Plaintiffs' own testimony and documentation show that they did not actually rely on any putative misrepresentations by the Enzo Defendants in connection with their relevant trading in Enzo securities, and even if they had so relied, that such

reliance was not reasonable as a matter of law.  Third, Plaintiffs simply cannot demonstrate loss causation.  Finally, Plaintiffs Cavanagh, Pope and Lewicki are not even able to prove any actual damages in their trading of Enzo securities during the relevant time period.

## STATEMENT OF FACTS

The relevant facts are set forth in the Enzo Defendants' accompanying Rule 56(c) Statement and will not be repeated here given the significant space limitations imposed.[1]

## ARGUMENT[2]

**POINT I:    THE CLAIMS OF PLAINTIFFS LEWICKI, CAVANAGH AND POPE ARE BARRED BY RES JUDICATA**

Larry Glaser sued the Enzo Defendants based on the same facts and virtually identical pleadings to those now presented.  Glaser's action was dismissed with prejudice by the U.S. District Court for the Eastern District of Virginia, the dismissal was affirmed by the Fourth Circuit, and the Supreme Court denied certiorari.  *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474 (4th Cir. 2006), *cert. denied*, 127 S. Ct. 1876 (2007) ("the Glaser Action").  The facts adduced in discovery demonstrate that Plaintiffs Lewicki, Cavanagh and Pope are privies of Glaser, and so closely tied to him that the outcome of the Glaser Action should have preclusive effect.

In evaluating whether res judicata bars a claim, courts consider whether a prior decision adjudicated the same cause of action against a party or its privies.  *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 639 (2d Cir. 1987).  For privity, New York courts recognize that a

---

[1]    References to deposition transcripts are prefaced with the first letter of the Plaintiff's last name.  For Cavanagh, reference to the transcript of his second day of testimony is referenced as "C2" since it is not consecutively paginated.  The transcript excerpts are annexed to the Declaration of Donald H. Chase, dated March 30, 2009 ("Chase Dec."), as Exhibits A (Cavanagh), B (Lewicki), C (Pope), and D (Roberts).

[2]    Summary judgment is mandated when a court concludes that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

non-party "may so involve himself with litigation in which he is interested that the result is res

judicata against him." *Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 277, 370 N.Y.S.2d 315, 321

(1970); *see also David v. Biondo,* 92 N.Y.2d 318, 323-24, 680 N.Y.S.2d 450, 452-53 (1998)

(courts evaluating privity should consider character, right, and extent of party's role in prior

proceeding). The evaluation considers whether "all of the facts and circumstances of the party's

and nonparty's actual relationship, their mutuality of interests and the manner in which the

nonparty's interests were represented in the previously decided litigation establishes a functional

representation such that the nonparty may be thought to have had a vicarious day in court." *In re

Slocum*, 183 A.D.2d 102, 104, 588 N.Y.S.2d 930, 931-32 (3d Dep't 1992) (finding privity based

on "a practical inquiry into the realities of the litigation").

Lewicki, Cavanagh and Pope are privies of Glaser. They were initially represented by

Glaser's counsel, Michael Rovell. Indeed, along with others, they retained Mr. Rovell in April

2001, well before Glaser's action was filed, even though their actions were not commenced until

January 2006. Plaintiffs agreed to pool their monies to fund counsel's investigation and joint

prosecution of their claims against the Enzo Defendants (Chase Dec. Ex. E). *See Ferris v.

Cuevas*, 118 F.3d 122, 127-28 (2d Cir. 1997) (fact that same counsel represented different

plaintiffs in successive litigations was of "singular importance" in imposing res judicata bar);

*Ruiz v. Commissioner of Dep't of Transp.*, 858 F.2d 898, 903 (2d Cir. 1988) (use of same

counsel of "singular significance" in imposing res judicata). Glaser and these Plaintiffs also

expressly agreed in their written retainer agreement to share any recoveries from their litigation

in specified percentages (Chase Dec. Ex. E). Thus, these Plaintiffs were entitled to a portion of

any recovery by Glaser in his action, and Glaser was and is entitled to a portion of any recovery

obtained in these actions (*id.*) The parties also gave one another a form of veto power over

3

settlements, since any settlement of Glaser's action required the approval of one of the other Plaintiffs, and any settlement of these Plaintiffs' actions requires Glaser's approval (*id.*; *see also* C1 135/2-25; L 55/6-22, 56/11-16; P 289/7-20, 295/2-22).

The parties, who considered each other "co-plaintiffs" (Chase Dec. Ex. E at G12427), also agreed that Rovell would file Glaser's case first, and then, assuming success, seek summary judgment for the other Plaintiffs (through collateral estoppel) in a coordinated litigation strategy (C1 222/1-8; L 48/10-13; P 76/23-77/22, 297/14-21; *see also* Chase Dec. Ex. E (341 Hearing Transcript)). Plaintiffs essentially planned to exploit Glaser's action for its potential legal benefits,[3] but hold back on their filings so as to have a second bite at the apple. When Rovell passed away, Glaser found Plaintiffs' new counsel, Dan Brecher, and loaned Pope the money to pay her share of the retainer (P 70/20-71/17). Lewicki and Pope even recently re-affirmed in writing their agreement, giving Glaser "power of attorney" to discuss the case with Brecher and restating his financial interest in Plaintiffs' claims (and their interest in his Enzo claim) (Chase Dec. Ex. E).

Given these unique facts, this Court should not hesitate to apply res judicata to bar the claims of these Plaintiffs. Indeed, as a matter of fundamental fairness, Plaintiffs should not be permitted to relitigate their claims when their very intent was to collaterally estop the Enzo Defendants by pointing to the Glaser Action. Otherwise, the Court will only encourage similar tactics of repetitive serial litigation based on the same allegations.

---

[3] In addition to the potential collateral estoppel effects, those legal benefits included Glaser's exploitation of liberal unilateral bankruptcy discovery procedures and his testing of various legal theories.

**POINT II:    THE CLAIMS OF PLAINTIFFS ROBERTS AND
CAVANAGH ARE BARRED BY THE STATUTE OF LIMITATIONS**

In this Court's December 11, 2006 decision, it held that "all plaintiffs' claims are time-barred unless they can show that the limitations period has been tolled."[4]  *Hunt v. Enzo Biochem, Inc.*, 471 F. Supp. 2d 390, 400 (S.D.N.Y. 2006) ("*Hunt I*").  The Court then determined that non-resident tolling provisions tolled the limitations period for the time that defendants were absent from the state.  *Id. citing* Cal. Code Civ. Proc. § 351 (2006); Mass. Gen. Laws ch. 260 § 9.  Significantly, this Court also noted that California and Massachusetts "prohibit the use of the tolling provision if the absent defendant is subject to personal jurisdiction in the state during the limitations period."[5]  *Id.* at 404 n.95.  The Court invited Defendants to "renew this motion at the close of discovery when more evidence might be presented to the Court that would support a finding that defendants were indeed amenable to jurisdiction in plaintiffs' resident states."  *Id.* at 408.  The facts now demonstrate that the Enzo Defendants were amenable to jurisdiction in California and Massachusetts so the claims of Roberts and Cavanagh are time-barred.

**A.    The Enzo Defendants Were Amenable To Jurisdiction In California**

The Enzo Defendants had sufficient contacts with California that Plaintiff Roberts could have exercised long-arm jurisdiction over them for his fraud claim.  The clinical trial at the heart of Plaintiffs' pleadings, *i.e.*, the Enzo-sponsored Phase I clinical trial testing the safety of Enzo's HIV treatment, was conducted at the University of California, San Francisco (Declaration of

---

[4]    Plaintiff Roberts is a California resident, and Plaintiff Cavanagh is a Massachusetts resident (*id.* at pp. 21-22; Roberts Comp. ¶ 11; Cavanagh Comp. ¶ 5).  Both states have three year limitations periods (*id.*; Cal. Code Civ. Proc. § 338(d) (2006); Mass. Gen. Laws ch. 260, § 2A).  This Court previously held that these Plaintiffs' fraud claims expired no later than June of 2004 absent any tolling.  *Hunt I*, 471 F. Supp. 2d at 403.

[5]    As this Court previously recognized, the non-resident tolling provisions would be unconstitutional under the Commerce Clause as applied if the absent defendants were subject to personal jurisdiction in-state during the limitation period.  *Hunt I*, 471 F. Supp. 2d at 405 n.100.

Barry Weiner, dated March 30, 2009 ("Weiner Dec.") ¶ 3). Starting in 1997, Weiner and other Enzo employees met face-to-face and corresponded with doctors in San Francisco, directed funding to California, and sent personnel there in connection with the trial (Weiner Dec. ¶ 3). In addition, Weiner met Roberts personally in California and allegedly repeated to him a number of the putative misrepresentations (R 122/2-17; Weiner Dec. ¶ 4).[6] These case-specific contacts alone show that California could exercise jurisdiction over the Enzo Defendants. Cal. Code Civ. Proc. § 410.10 (California courts "exercise jurisdiction on any basis not inconsistent with the Constitution"); *see Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003) (finding jurisdiction based on defendant's business contacts with forum); *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (jurisdiction exists when defendant "is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state").

Enzo also does substantial business in California. Between 2000 and 2002, Enzo sold over $22 million in products in California, 14% of Enzo's annual revenue those years (Weiner Dec. Ex. 1).[7] Enzo has long employed a California sales agent (*id.* ¶ 5). One of Enzo's largest licensing agreements is with a California company (*id.*) Enzo's single largest shareholder (which owns 15% of Enzo stock) is located in California (*id.* ¶ 7). Enzo maintains a regularly updated (and readily accessible) website that contains, among other things, Enzo's public filings and

---

[6]    Mr. Roberts testified that he met Mr. Weiner at the Beverly Wilshire Hotel and that Mr. Weiner stated that "everything was moving forward," and "we don't see any problems," and "we've had quite a bit of success in our trials," and "we will be moving forward into Phase II" (R 122/2-123/4, 318/24-320/3).

[7]    Thereafter, from 2003 to 2005, Enzo sold over $14 million in products in California or 10% its annual revenue those years.

press releases, some of which are the subject of Plaintiffs' claims (*id.* ¶ 6).[8] Enzo was and is also registered to sell its shares in California, and its shares are traded on the Pacific Stock Exchange in California (Roberts Compl. ¶ 6). *Hernandez v. Barcelo Hotels & Resorts*, Nos. B170853, B172114, 2005 Cal. App. Unpub. LEXIS 351 (App. Ct. Jan. 13, 2005) (finding general jurisdiction over company that regularly advertised and occasionally attended trade shows in California and maintained website that California residents could view). Since at least 2000, Barry Weiner has taken at least four or five trips annually to California to meet with investors, attend conferences, and meet with research institutions (Weiner Dec. ¶ 8).[9]

The variety and scope of the Enzo Defendants' contacts with California clearly made them amenable to jurisdiction in California at all relevant times.[10] *See, e.g., Snowney v. Harrah's Entm't, Inc.*, 35 Cal. 4th 1054, 1062, 29 Cal. Rptr. 3d 33, 40 (2005) (finding jurisdiction based on defendant's "purposeful and successful solicitation of business from California residents"); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

**B.    The Enzo Defendants Were Amenable To Jurisdiction In Massachusetts As Well**

Massachusetts's long-arm statute, G.L. c. 223A § 3(d), allows a court to exercise personal jurisdiction over a corporation based on its "causing tortious injury in this commonwealth by an act or omission outside this commonwealth if [it] regularly does or solicits business, or engages

---

[8]    Roberts testified that he personally received press releases and other communications from Enzo (R 60/24-61/19).

[9]    The Enzo Defendants are alleged to have committed a fraud causing substantial injuries in California through conduct both within and outside California. As such, jurisdiction would also clearly exist for this reason alone (*Hunt I*, 471 F. Supp. 2d at 406). *See Calder v. Jones*, 465 U.S. 783 (1984); *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002).

[10]    The Enzo Defendants were also defendants in the Glaser Action in Virginia where personal jurisdiction was asserted and not challenged. Plaintiffs were well aware that the Enzo Defendants acceded to jurisdiction in Virginia, and they had no reason to believe that the Enzo Defendants would not similarly accede to jurisdiction in California or Massachusetts.

7

in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth." Between 2000 and 2002, Enzo sold approximately $1.2 million in products into Massachusetts (Weiner Dec. Ex. 1). Enzo also employed a Massachusetts sales agent (*id.* at ¶ 9). Several significant suppliers for Enzo products are also located in Massachusetts, and Enzo ordered over $500,000 in supplies annually from Massachusetts (*id.* at ¶ 10). Enzo also has significant contractual relationships with PerkinElmer, which is based in Massachusetts, as well as distributorship agreements with, among others, NEN Life Sciences (*id.* at ¶ 10). One of Enzo's most significant shareholders is located in Massachusetts (*id.* ¶ 12) Enzo was also registered to sell its shares in Massachusetts, and its shares are traded on the Boston Stock Exchange (Roberts Compl. ¶ 6). Because of the numerous pharmaceutical companies and academic institutions in the Boston area, Weiner personally travelled to Massachusetts four or five times a year for conferences and meetings with corporations and investors (Weiner Dec. ¶ 12). Given these contacts, the Enzo Defendants must be deemed to have regularly solicited and transacted business in Massachusetts. *See Darcy v. Hankle*, 768 N.E.2d 583 (App. Ct. 2002) (jurisdiction exists when defendant made sales over three years to Massachusetts residents); *Balloon Bouquets, Inc. v. Balloon Telegram Delivery, Inc.*, 466 N.E.2d 523, 525 (1984) (jurisdiction appropriate when defendant's contacts with state are not "isolated incidents"). Enzo also "derive[d] substantial revenue" from its Massachusetts business contacts. *See, e.g., Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 219 (1st Cir. 1989) (substantial revenue "is not an absolute amount nor an absolute percentage of total sale," and $15,000 sale of shoes "easily meets" requirement); *Mark v. Obear & Sons Inc.*, 313 F. Supp. 373, 375-76 (D. Mass. 1970) ($5,000 in sales met statutory requirement); *Hankle*, 768

N.E.2d at 588 (substantial revenue test met even if dollar volume of business is modest and small percentage of defendant's over-all gross sales).

Accordingly, the Enzo Defendants "'purposefully directed' [their] activities at residents" in Massachusetts, such that the exercise of long-arm jurisdiction will not offend due process. *Gray v. Michael Stapleton Assocs., Ltd.*, 2007 Mass. Super. LEXIS 157 (Super. Ct. May 7, 2007) (allowing jurisdiction based on defendant's regular solicitation of business from Massachusetts residents) (*quoting Heins v. Wilhelm Loh Wetzlar Optical Machinery GmbH*, 522 N.E.2d 989 (1988) (jurisdiction exists when employees of defendant company attempted to sell its products during 8 visits to Massachusetts over a 7 year period); *see also Chase-Walton Elastomers, Inc. v. Bennett*, No. 02-1304, 2002 Mass. Super. LEXIS 368 (Super. Ct. Oct. 1, 2002) (defendant's regular sale of goods to Massachusetts retailers supported exercise of long-arm jurisdiction, even though claims arose from events in England).[11]

---

[11]    Even if this Court were to conclude for any reason that the Enzo Defendants were not amenable to jurisdiction in California and/or Massachusetts, the non-resident tolling statutes at issue would be unconstitutional under the Commerce Clause as applied to this case. Plaintiffs purposefully delayed bringing their actions as a tactical ploy even though counsel was retained more than four years before they commenced suit. *See Braune v. Abbott Labs.*, 895 F. Supp. 530 (E.D.N.Y. 1995) (statute of limitations protects defendants from suits "commenced late for strategic purposes"). Moreover, Plaintiffs did not bring suit in their home state, but in New York, where the Enzo Defendants were always amenable to jurisdiction. *See Doyle v. Shubs*, 717 F. Supp. 946 (D. Mass. 1989) (non-resident tolling statute inapplicable when plaintiff's late filing was not impacted by defendant's residing out of state). Under the Commerce Clause, Courts must weigh "the State's putative interests against the interstate restraints to determine if the burden imposed is an unreasonable one." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 891, 108 S. Ct. 2218, 2221-22 (1988) (finding non-resident tolling provision unconstitutional as applied). Here, there is no state interest supporting tolling, so it is unconstitutional to apply the non-resident tolling provisions. *See Heritage Marketing Ins. Servs., Inc. v. Chrustawka*, 160 Cal. App. 4th 754, 73 Cal. Rptr. 3d 126 (Ct. App. 2008).

**POINT III:    PLAINTIFF LEWICKI LACKS THE CAPACITY TO
PURSUE HIS COMPLAINT BECAUSE OF HIS FAILURE
TO DISCLOSE IT IN HIS BANKRUPTCY PROCEEDING**

Plaintiff Lewicki filed for Chapter 7 bankruptcy on or about May 4, 2004 (Chase Dec. Ex.

F), more than four years after the events at issue and years after he retained Mr. Rovell, but prior

to commencing this action in January 2006.  Lewicki was ultimately discharged from bankruptcy

on or about August 24, 2006, many months after this action was commenced (*id.*).  Lewicki was

aware of his potential claim against the Enzo Defendants when he filed for bankruptcy, yet he

failed to list it as an asset in his bankruptcy petition, a document he attested to under oath. (*id.*).

Lewicki did not notify the Bankruptcy Trustee prior to his discharge that he had commenced this

action against the Enzo Defendants.[12]  In fact, as of the time of his recent deposition, neither

Lewicki nor his counsel had ever notified the Bankruptcy Trustee of the existence of this action

despite the fact that Lewicki admittedly discharged and reduced significant loans in his

bankruptcy, which loans were used in part to fund the Enzo trading that is the subject of his

action.[13]  (L 115/24-116/6, 117/9-21, 160/23-161/13)  Further, when one of his creditors raised

---

[12]    Lewicki also failed to state disclose in his bankruptcy proceeding that he had an interest
in any recovery in the Glaser Action and the actions against Enzo by the other Plaintiffs such as
Cavanagh and Pope. *See* Point I above and Chase Dec. Ex. E. Lewicki also represented to the
Bankruptcy Trustee that the statute of limitations had run on any potential claim against his
broker, Morgan Stanley (*id.* Ex. F).  He never informed her that he eventually pursued an
arbitration claim against Morgan Stanley as well, also prior to his discharge in bankruptcy, based
upon his same alleged losses in trading Enzo options as are at issue in this action and that he
settled that proceeding for $95,000 (L 43/23-25, 44/23-45/17).   Indeed, no portion of that
settlement was remitted to the Bankruptcy Trustee.

[13]    Lewicki used the loans to fund frequent highly speculative short term trades in Enzo
options that risked a multiple of his annual income (L178/12-179/5, 436/11-19).

the claim, Lewicki told the trustee that his case "was identical basically to the Glaser suit," so he did not have a claim (L 48/10-17, 49/2-4).[14]

New York courts have long recognized that "a debtor's failure to list a legal claim as an asset in his or her bankruptcy proceeding causes the claim to remain the property of the bankruptcy estate and precludes the debtor from pursuing the claim on his or her own behalf." *Mehlenbacher v. Swartout*, 289 A.D.2d 651, 734 N.Y.S.2d 290 (3d Dep't 2001) (dismissing claims when plaintiff did not list them as assets in Chapter 7 bankruptcy filed after their accrual). *See Sea Trade Co., Ltd. v. FleetBoston Fin. Corp.*, No. 03 Civ. 10254, 2008 U.S. Dist. LEXIS 67221, at *37 (S.D.N.Y. Sept. 4, 2008) (listing "courts of this and other circuits [that] have precluded debtors who have failed to identify accrued causes of action in their schedule of assets from pursuing claims on their own behalf after emerging from bankruptcy"). Plaintiff Lewicki's failure to disclose or adjudicate his claim in his bankruptcy proceeding deprives him of the legal capacity or standing to pursue the claim in this action. *See Whelan v. Longo*, 7 N.Y.3d 821, 822 N.Y.S.2d 751 (2006). This Court should accordingly dismiss Lewicki's claim.

**POINT IV: PLAINTIFFS CANNOT PROVE AS A MATTER OF LAW THE REQUISITE ELEMENTS FOR THEIR COMMON LAW FRAUD CLAIM**

Plaintiffs each allege a sole fraud claim, requiring them to prove: "(1) a misrepresentation or omission of material fact; (2) that the defendant knew to be false; (3) that the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5)

---

[14]    At Lewicki's Rule 341 Bankruptcy Hearing held on May 7, 2004, he was asked: "Do you have a claim against anyone or any business?" He responded: "No, I don't." (Chase Dec. Ex. F (341 Hearing Transcript)). He subsequently was asked by his counsel about Morgan Stanley and Mr. Rovell. He answered: "It was a case against Enzo Biochem. Basically what happened was my friend, he's suing the company, and if he would have won his case, we would have had summary judgment but his case was dismissed" (*id.*).

that caused injury to the plaintiff." *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 592 (S.D.N.Y. 2008) ("*Hunt II*"). Plaintiffs cannot prove up their claim as a matter of law.

## A.    Enzo's Alleged Misrepresentations Are Either Demonstrably True Or Not Actionable

The Fourth Circuit reviewed Glaser's virtually identical complaint and ultimately determined that there were only eight statements alleged therein that could possibly serve as the basis for a common law fraud claim. *See Glaser v. Enzo Biochem, Inc.*, No. 03-2188, 2005 U.S. App. LEXIS 4598, at *15-16, 22 n.6 (4th Cir. Mar. 21, 2005). Those statements consist of two allegedly made by Dean Engelhardt: (1) "It works, they both work," and (2) "The virus goes in but does not come out." The next three statements were allegedly made by Barry Weiner: (3) "that Enzo had submitted Phase 1 data to the FDA and was awaiting Phase II approval," (4) "that Enzo scientists had reduced the time required for HGTV-43 transduction from up to three months to eighteen hours," and (5) "that the HGTV-43 vector achieves levels of stable transduction greater than 30%." Finally, there were three statements allegedly made through Enzo press releases: (6) "the University of California clinical study was moving to its final stages, an abstract was to be presented to the American Society of Gene Therapy in June 2000, Enzo knew of no other system that achieved the results that its gene therapy had achieved, and plans for Phase II trials were proceeding," (7) "the HGTV-43 vector successfully delivered certain genes to blood stem cells and engineered cells continued to survive after transduction," and (8) "data from the first person treated in the Phase I trial of HGTV-43 showed successful engraftment of engineered cells into the patient's bone marrow."

With respect to the alleged statements regarding Enzo's early clinical trial results, including statements ## 3, 4, 5, 6, 7, and 8 above, none of the Plaintiffs could support their allegations that any of these statements were false, all of which allegations were purportedly

based solely on attorney investigation.  (C 147/9-12, 205/14-15, 243/19-244/8; L 357/21-358/4;

P 379/21-383/8; R 187/11-15, 193/17-194/2).  *See In re Initial Pub. Offering Sec. Litig.*, 241 F.

Supp. 2d 281, 351 n.1 (S.D.N.Y. 2003) (Scheindlin, J.) (allegations based on attorney

investigation are hearsay).  The Enzo Defendants are unaware of any evidentiary proof that these

alleged statements were false.  To the contrary, as Dr. Thalenfeld's Declaration shows, each

statement was in fact true.

With respect to Statement #1, the transcript of the 2000 Meeting shows a statement by

Engelhardt: "I believe both will work" (Chase Dec. Ex. G at 37).    Glaser's own

contemporaneous notes from the 2000 Meeting also confirm that this was the actual statement

(*id.* at Ex. G at 2).  Moreover, to the extent that there was any confusion as to this statement or

similar statements made by Enzo at the shareholders meeting, it was clearly corrected almost

immediately in Enzo's press release on the very day of the meeting which stated as follows:

> "'We are encouraged by these findings,' said Mr. Weiner.  However, he cautioned
> that the Phase 1 trial, which is designed primarily to determine safety and toxicity in
> patients, was not yet completed, and that further evaluation of treated individuals and
> treatment of additional patients was needed to fully document efficacy.  Enzo is
> currently exploring additional clinical sites to expand the study."

Chase Dec. Ex. H. Similarly, the Dow Jones News Release dated February 16, 2000, reported:

> "'Preliminary data from its early stage clinical trials encourage Enzo's therapeutic
> division to proceed further, and the Farmingdale, N.Y., biotechnology company may
> have found a general approach for delivering gene medicine to fight virus cells' . . . .
> 'Because phase I trials for an HIV treatment haven't concluded, and safety and
> efficacy data has yet to be gathered and analyzed, some might say these assessments
> are too early.  But so far, these trials have gleaned promising data,' Weiner and
> Engelhardt said ... 'The treatment does more than stopping the virus cold; it makes
> the virus disappear. *In some of the early trials' petri dish work, 99.9% of the virus'*
> *genes were no longer present after the insertion of the proposed treatment,*' said
> Engelhardt."

*Id.* Ex. I (emphasis added).

With respect to Statement #2, this statement was likewise true in a lab context which is the context in which the statement was made by Engelhardt. This is evident both from the transcript of the shareholders meeting produced by Enzo (Chase Dec. Ex. G at pp. 29-30), Glaser's own allegedly contemporaneous notes of the meeting (*id.* at Ex. G), and the Enzo press release quoted above and cited by Plaintiffs in their Complaint (*id.* at Ex. H).[15]

As demonstrated above, there were no material misstatements by the Enzo Defendants to Plaintiffs. While Plaintiffs may have been confused by, and/or ignored the full context and scope of, Enzo's statements, including its forward-looking statement disclaimer at the 2000 Meeting (Weiner: 352/15-353/5), Enzo is not responsible for Plaintiffs' misconstruction and/or failure to read or appreciate its clear public disclosures.[16]

**B.    Plaintiffs Did Not Reasonably Rely On Any Alleged Misstatements**

As this Court previously held, the "fraud on the market" theory is "still not available to those alleging common law fraud." *Hunt II*, 530 F. Supp. 2d at 598. To prove reliance, Plaintiffs must therefore "demonstrate direct and actual reliance on [Enzo's] alleged misrepresentations." *Id.* (*citing, inter alia, In re Marsh & McClennan Cos., Inc.*, 501 F. Supp. 2d 452, 495 (S.D.N.Y. 2006)).

---

[15]    To the extent Plaintiffs recalled similar statements from the 2000 Meeting such as Enzo had "done it" or cured AIDS (L 36/16-19; P 49/19-50/5; R 160/22-24), "it works" (L 36/22-25; R 182/17-20), it was all over but the shouting (L 232/9-16, R 183/22-184/4), and Enzo had "killed the virus" (L 36/13-20), Cavanagh and Lewicki admitted that Enzo could have been referring to its lab work, rather than its clinical trial results (C 250/4-251/25; L 307/25-308/12). Each of those statements was accurate in the lab context (Declaration of Dr. Barbara Thalenfeld, dated March 30, 2009 ("Thalenfeld Dec.") ¶ 19).

[16]    To the extent Plaintiffs complain about the Enzo Defendants' upbeat and positive statements, such statements are not actionable. *See Hampshire Equity Partners II L.P. v. Teradyne, Inc.*, No. 05-CV-2279, 2005 U.S. App. LEXIS 28817 (2d Cir. Dec. 20, 2005) (holding statements "in the nature of opinion or puffery" are not actionable).

1.    **Plaintiffs Did Not Actually Rely On Any Purported Misstatements**

Although the Complaints suggest that Plaintiffs relied on a range of materials in making Enzo trading decisions (*see, e.g.*, Roberts Compl. ¶¶ 41-45), several Plaintiffs disavowed any reliance on such written materials (C 236/18-21; P 30/6-24; R 199/12-200/11, 214/24-215/14). Further, Plaintiffs all admitted at various points in their depositions that they did not rely on Enzo's alleged misrepresentations in making specific trading decisions in Enzo Securities, particularly with respect to their trading in Enzo options:

- Roberts could not point to a single misrepresentation on which he relied in making his decisions to buy and sell Enzo securities (R 271/25-272/6, *see also* R 235/14-17, 237/15-23, 245/11-14, 269/6-25, 270/20-271/24, 273/17-24, 274/13-19).

- Cavanagh never bought "an option for Enzo securities based specifically on a representation that was made by Enzo" (C 92/11-20).

- Lewicki could not remember any specific representations by the Enzo Defendants that he relied on in determining that the stock would go up a set amount in a given time frame for his options trading (L 263/3-10, 265/13-20, 273/23-274/23, 390/4-21, 433/19-434/14, 436/11-19).

- For her options trading, Pope could not identify any specific Enzo statements on which she relied to indicate that the stock would appreciate during an option window (P 490/10-492/9).

Each Plaintiff's trading activity further confirms that he or she was not relying on any of the Enzo Defendants' purported misrepresentations. Although Roberts claimed that he left the 2000 Meeting feeling very bullish about Enzo, he sold 10,000 shares of Enzo stock the next day for $450,000 (R 234/12-21). Over the next several months, Roberts vigorously day-traded large amounts of Enzo stock (R 238/3-10, 239/17-21, 240/18-241/22, 242/3-12, 244/20-245/14, 247/3-23, 249/21-250/11, 270/20-271/24). He could not tie a single purchase or sale to the Enzo Defendants' purported misrepresentations (*see above*), even for days on which he traded up to $1 million of Enzo stock (R 250/12-22, 270/20-271/24).

After selling stock shortly after the 2000 Meeting, on January 25, 2000, Pope also day traded Enzo securities, including short-term calls, repeatedly in February 2000 (P 466/22-467/21). She was worried about price drops but her broker reassured her and encouraged her to purchase more Enzo securities (P 469/9-23, 470/11-17). In March 2000, Pope day-traded Enzo because she saw price movement in the stock and thought that Enzo might make some announcements, though her belief was not based on anything Enzo said (P 490/10-492/9). Although she had retained Rovell by early April 2001, she continued to trade Enzo puts and calls in 2002 (P 495/17-496/3, 510/19-511/12, 513/22-514/4).

Cavanagh invested in Enzo almost continuously since 1996 (C 225/18-226/4), would not have sold shares in 2000 but for a margin call (C2 103/7-11), and currently owns thousands of shares of Enzo, and will continue to do so for as long as he can (C 228/8-10) because its "technology indicates that they have a successful technology" (C 229/14-19; *see also* C2 104/3-105/22). In fact, in 2007, well after this action was commenced, he "guaranteed" to Pope that she would earn money investing in Enzo (C 216/3-19, 219/17-19, P 232/17-233/4). On the other hand, on April 19, 2000, Cavanagh lost $450,000 on three puts, betting that Enzo's stock would drop at a time that he supposedly believed that Enzo's stock would rise (C2 90/10-19).

Almost all of Lewicki's Enzo trades were in naked options (L 37/23-38/6). He last invested in Enzo in August or September 2001 (L 25/3-13), months after he retained Mr. Rovell. His two brokers, first Mitch Drucker at Sandgrain Securities and then, starting in June or July 2000, David Polifroni of Morgan Stanley Dean Witter ("Morgan Stanley"), advised him "as to what purchases or sales to make in Enzo stock" (L 61/14-21). Lewicki claims that he did not understand his trading. In fact, he claims he did not understand that Enzo's stock price could go

up, but that he could still lose his entire investment in an option if Enzo's price did not rise
higher than the strike price (L 292/25-293/11).

Based on their testimony and trading activities, Plaintiffs will simply not be able to show
that they actually relied on any purported misrepresentations.

### 2.    Any Alleged Reliance On The Enzo Defendants' Purported Statements Was In Any Event Not Reasonable As A Matter Of Law

Even if Plaintiffs could demonstrate that they actually relied on material
misrepresentations by the Enzo Defendants, such reliance would in any event not be reasonable
as a matter of law given all the public disclosures by Enzo and others, and the readily available
information that could have cured Plaintiffs of any misconception they may have had with
respect to Enzo's HIV trials.

Plaintiffs' view of Enzo's HIV trials flies in the face of Enzo's public warnings. As of
1996, Roberts understood that Enzo "had what was considered a cure for AIDS" that would be
available "imminently" (R 64/14-15, 65/15-23, 76/18-77/8), and from then on never understood
that the HIV treatment might not go to market (R 143/9-144/6). Further, he understood that this
was public information – everyone knew that Enzo had "cured" AIDS, and was just "go[ing]
through a process" get approval (R 127/13-17, 204/20-25). Roberts had no other information on
Enzo, the biotech sector, the FDA approval process for drugs, or the heightened scrutiny that the
FDA applied to genetic treatments (R 112/4-7, 131/17-132/6, 143/4-6). He did not have "the
slightest idea" what Enzo's HIV treatment involved (R 140/21-24). Similarly, Pope believed for
some reason that the Phase I testing included 200 participants, and showed that Enzo "found the
cure for HIV and that they were getting ready for Phase Two to continue their works to help
people" (P 375/25-376/6). Pope did not understand the HIV treatment, which was "way over
[her] head," and relied only on Dr. Engelhardt's statement that everything "was working" (P

378/24-379/17). While Cavanagh never understood Enzo's technology, he at least admitted that no one ever told him Enzo had a cure for AIDS (C 244/11-16, C2 16/1-3).

In fact, Enzo repeatedly cautioned that its HIV treatment was extremely novel, and faced significant hurdles to commercialization. For example, Enzo reported in its 1998 and 1999 10-Ks (the latter issued only a few months before the 2000 Meeting) that the treatment still faced substantial testing to determine whether it would work (Chase Dec. Ex. J at 7-8 (stating that "there can be no assurances that [Enzo's] preclinical success in culture [with HIV treatment] can be repeated in human trials")). Further, Enzo reviewed at length the hurdles in obtaining government approval, specifying that "[o]btaining FDA approval has historically been a costly and time consuming process," particularly for treatments involving genetic modifications (id. Ex. J at 9-10). In its press releases in 2000, including its release on the very day of the 2000 Meeting, Enzo also repeatedly warned that its HIV treatment was still early in the testing process. See, e.g., id. Ex. H at January 12, 2000 release (cautioning that Phase I HIV trial "was not yet completed, and that further evaluation of treated individuals and treatment of additional patients was needed"); March 16, 2000 release (warning trial was "first step forward in the development of a gene medicine for the treatment of HIV-1 infection"); June 2, 2000 release (announcing "preliminary results"); June 15, 2000 release (announcing that Enzo would be "proposing Phase II studies of" its HIV treatment).

Enzo reiterated in interviews the preliminary nature of its HIV testing. In a February 4, 2000 article, Engelhardt stated that he was "very encouraged" by the "early data" from "at least one patient." In a February 16, 2000 interview, Weiner stated that the "phase I trials for an HIV treatment haven't concluded, and safety and efficacy data has yet to be gathered and analyzed, . .

. [though] these trials have gleaned promising" preliminary data.[17] Two days later, Weiner told a reporter that "further tests [were] needed to determine the [HIV] treatment's effectiveness" (*id.* Ex. I). In light of Enzo's public statements about the preliminary nature of the HIV trial, no one reasonably could have believed that Enzo had cured AIDS, as some of the Plaintiffs allegedly believed, or that Enzo was months from FDA approval and marketing of the treatment.

Even putting aside the Enzo Defendants' repeated descriptions and cautions relating to the HIV trial after the 2000 Meeting, Plaintiffs' testimony at face value shows that their reliance was not reasonable. According to Roberts, the public knew that Enzo had cured AIDS by 1996, and that the cure would be available imminently (R 65/15-23, 76/21-77/8, 127/16-17, 204/20-25). There was no fanfare about this purported AIDS cure though, and by the 2000 Meeting, four years later, Enzo still had not obtained FDA approval for this cure. Similarly, Pope claimed that she thought that there were only two phases of FDA trial, and that completing Phase I meant that Enzo had already proven that it had cured AIDS (P 375/25-376/6). Lewicki simply professed not to be aware that Enzo's HIV treatment could be years from market, even though he claimed to read Enzo's press releases and public filings (L 22/17-21, 170/14-17), while Cavanagh just ignored releases he did not understand (C 207/10-17, C2 20/4-10). Plaintiffs' gross misapprehension of the facts relating to the FDA approval process and Enzo's clinical trials vitiates any claim of reasonable reliance.

**C.      Plaintiffs Cannot Prove Loss Causation**

In denying in part the Enzo Defendants' prior motion to dismiss, the Court found two speculative allegations satisfied the loss causation pleading requirements: (1) Enzo made bullish statements at the 2000 Meeting, which the market realized were false over the next several

---

[17]      Lewicki allegedly relied on Weiner's statements in the February 16 article that Enzo "could stop the virus cold," but ignored the statements' laboratory context (L 320/20-321/17).

months; and (2) the release of a private placement memo UBS prepared (the "UBS PPM") allegedly coincided with a drop in Enzo's stock price. *Hunt II*, 530 F. Supp. 2d at 587. Discovery has not provided evidence supporting loss causation based on either allegation.

1.    **Plaintiffs Cannot Show That Enzo's Stock Price Fluctuation Was Attributable To Misrepresentations Rather Than Market Volatility**

Plaintiffs allege that Enzo's misrepresentations at the 2000 Meeting caused the stock price to rise, and that the price dropped over the next several months because the lack of announcements about the opening of HIV clinics acted as a corrective disclosure. In the first instance, since any statement about the future opening of clinics spoke to Enzo's future intentions and is not actionable as a matter of law, and since Plaintiffs also lack evidence that Enzo's intentions were not genuine, this theory of loss causation necessarily fails. In addition, as previously discussed, to the extent a corrective disclosure of alleged misstatements at the 2000 Meeting was necessary, Enzo provided it in a press release issued that same day and in interviews published in early and mid-February 2000. (Chase Dec. Exs. H, I). Even putting that aside, during the months after the 2000 Meeting, Enzo's stock activity actually tracked the stock market's biotechnology sector as a whole. In particular, from late 1999 through the early months of 2000, the stock market's biotechnology sector rose dramatically, as did Enzo's stock. The bubble began deflating in early 2000 and then "burst" on about March 15, 2000, a trend that Enzo's stock largely mirrored (Chase Dec. Ex. I).

Plaintiffs have not provided evidence that would show that their loss was caused by something other than the general bursting of the "biotech bubble." *Compare* Chase Dec. Ex. K, *with* R 133/3-9, 134/12-22. In fact, a newspaper article published on January 19, 2000, one week after the 2000 Meeting, compared Enzo's rising stock price to other biotech stocks' successes (Chase Dec. Ex. K), a comparison that holds for Enzo's stock price drop as well.

> '[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by fraud decreases,' and a plaintiff's claim fails when 'it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005), *quoting First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994); *see also Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229 (S.D.N.Y. 2006); *Catton v. Defense Tech. Sys.*, No. 05 Civ. 9654, 2006 U.S. Dist. LEXIS 205, at *40-42 (S.D.N.Y. Jan. 3, 2006).

Even if certain statements at the 2000 Meeting were inaccurate, Plaintiffs still have not provided any evidence that Enzo's stock price fluctuation is attributable to a "corrective disclosure" of such a statement. The assertion of nothing more than the passage of time during a period in which the overall biotech sector was declining is not proof of anything. Plaintiffs simply offer nothing other than pure speculation that Enzo's stock price decline during this period resulted from the lack of disclosures in the months following the 2000 Meeting, as opposed to the overall decline in the biotech market. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347-48 (2005)(dismissing claim for lack of loss causation); *In re Williams Sec. Litig. – WCG Subclass*, No. 07-5119, 2009 U.S. App. LEXIS 3032 (10th Cir. Feb. 18, 2009) (rejecting theory that truth "leaked out" into market over time and stating that plaintiff "cannot simply state that the market had learned the truth by a certain date and, because the learning was a gradual process, attribute all prior losses to the revelation of the fraud").

## 2.    The UBS PPM Was Not A Corrective Disclosure

Plaintiffs claim that the UBS PPM was a corrective disclosure that negatively impacted Enzo's stock price. Discovery shows Plaintiffs cannot support that claim. To begin, Plaintiffs cannot point to anything in the UBS PPM that "corrects" marketplace information. To the extent

that they claim that the UBS PPM informed the market that Enzo's HIV treatment was far from market, the market was already well aware of that information based on Enzo's repeated statements that it was still early in the years-long FDA approval process in its October 1999 10-K, in no less than four press releases it issued between January 12 and June 15, 2000, and in press interviews (Chase Dec. Exs. H, I). Moreover, as with any private placement memorandum, the UBS PPM is designated "STRICTLY CONFIDENTIAL" on its cover page, and states on the first page that prospective investors may not release the document, discuss information contained it in, or use the information "for any purpose other than evaluating a potential investment" pursuant to the offering. Plaintiffs have not provided any evidence suggesting that any recipients traded on the UBS PPM, or provided anyone else with information from the UBS PPM. Plaintiff's argument requires a double presumption, based on pure speculation, that institutional investors shared and traded on the UBS PPM.

**D.    Lewicki and Pope's Claims Also Fail Due To Additional Deficiencies**

Lewicki and Pope face an additional hurdle. Both filed arbitrations against their brokers claiming that the brokers – not Enzo – misled them and caused their trading losses. Pope claimed that she tried to sell Enzo stock after the 2000 Meeting, but that her broker first ignored her order and then repeatedly talked her out of selling stock (P 50/16-51/15, 455/25-456/4; *see also* Chase Dec. Ex. M). In fact, he talked her into buying 1,000 shares on January 25, 2000 (P 130/20-22, 131/5-8, 160/14-24, 455/13-24), and repeatedly solicited her to buy and sell Enzo stock (P 161/23-162/8). At other times, Pope's broker refused her sell orders (P 149/4-12). She settled the case against her broker and his firm for $118,000 (P 320/25-321/6, 324/8-10).[18]

---

[18]    As a result of her broker's alleged failure to sell her Enzo stock in January 2000, Pope remained "in a state of panic" because she did not want to miss another opportunity for a large gain (P 492/13-21). After that, Pope risked tens of thousands of dollars (a multiple of her annual

Given Pope's allegation that her broker drove her trading, which led her to make panicked trading decisions to multiply her early $230,000 profit, Pope cannot show reliance or causation.

Lewicki faces a similar problem. At Sandgrain, Lewicki's first brokerage account, where he traded until mid-June 2000, Lewicki netted over $200,000 on Enzo trading (L 279/20-280/16), plus an additional $318,000 from options that transferred to Morgan Stanley (L 282/16-24). At Morgan Stanley, however, Lewicki felt that his broker "encouraged [him] to go into the options" because "he just wanted the commissions" (L 172/23-173/5). Even after Lewicki began losing money, the broker "encourag[ed] [Lewicki] to stay in Enzo" because Enzo was "strong" (L 173/6-7, 173/20-21), and continued to engage in "excessive" trading (L 186/2-9). While Lewicki gives lip service to a belief in Enzo in general and states that he "just bought to hold" (L 263/14-23), his expert report in the arbitration he filed against Morgan Stanley showed that Lewicki's options had, on average, 41 days to expiration (L 289/13-18; *see also* Chase Dec. Ex. M). Lewicki professed not to understand that his trading strategy was risky, or that his investments were so short-term (L 295/6-10). He did not even understand that Enzo's stock price could rise but that he could still lose his investment if Enzo's price did not reach the option strike price (L 292/25-293/14). Indeed, if Lewicki had purchased and sold stock, rather than options, he would have made money on many of his Enzo investments (L 250/18-251/25). He purchased options rather than stock because he was "relying on [his] broker's advice . . ." (L 257/5-10). Again, given Lewicki's claim that his trading was driven by his broker, and that he did not understand options trading (despite the enormous volume of his trading), he cannot show reliance or causation.

---

income) because she "was trying to get back the money that [she] would have had if [her broker] had sold" her shares according to her instructions (P 454/13-23). It "frustrated [Pope] that [she] didn't have that $900,000 profit" (P 454/24-455/3), but rather had realized only a $230,000 profit by March 2000 (P 456/7-11).

E.    **Plaintiffs Lewicki, Cavanagh And Pope Are Unable To Prove Actual Damages**

Assuming they were to survive all the other deficiencies in their claim, Plaintiffs Lewicki, Cavanagh and Pope are also unable to demonstrate any actual losses caused by Enzo's alleged misrepresentations. The precise time period to be used for purposes of calculating Plaintiffs' alleged damages depends upon a number of factors, including which, if any, alleged misrepresentations are actionable, and when the Court determines that the market became aware of the supposedly true facts. In any event, based upon the testimony of these Plaintiffs and the documentation they provided of their alleged trading losses, they appear to be unable to prove any actual losses relevant to their claim.

First, there is significant evidence that Cavanagh and Lewicki did not lose money on their trading in Enzo stock during the relevant time period. Indeed, Cavanagh's records reflect that he earned a profit of approximately $1.2 million on his trading in Enzo stock in 2000, and even though he lost money on his short-term options trading in 2000, those losses were almost exclusively related to puts and not calls so they have nothing to do with his claims (Hunt Compl. Ex. 7, Chase Dec. Ex. L). Overall, Cavanagh still made approximately $700,000 in profits on all Enzo trading in 2000 (*id.*). Pope's own 2000 tax return shows that she earned a profit of $66,031 on her Enzo trading in 2000 (Chase Dec. Ex. L). Finally, after Lewicki's deposition demonstrated that his own expert in his Morgan Stanley arbitration calculated that he had earned over $200,000 during the relevant period in 2000 (L 278/3-16, 279/20-280/16), he rejiggered his damage calculations (Chase Dec. Ex. L). Lewicki's most recent chart reflects alleged damages totaling $13,000, but even that total fails to take into account Lewicki's settlement recovery from his broker based on his same trading in Enzo securities (L 43/23-25, 44/23-45/2). Since these

Plaintiffs have no actual losses in the relevant time period, their claims must be dismissed for this reason as well.

## CONCLUSION

For all of the foregoing reasons, the Enzo Defendants respectfully request that this Court grant them summary judgment dismissing Plaintiffs' Complaints with prejudice and such other and further relief as may be just and proper.

Dated:      New York, New York
            March 30, 2009

                                      MORRISON COHEN LLP

                                      By:_____
                                          Donald H. Chase
                                          909 Third Avenue
                                          New York, New York  10022
                                          (212) 735-8600

                                      *Attorneys for Defendants Enzo Biochem, Inc. and
                                      Barry Weiner*